## Case No. 66.

### ADAMS v. STOREY.

[1 Paine, 79;[1] 6 Hall, Law J. 474.]

Circuit Court, D. New York. April Term, 1817.

BANKRUPTCY—STATE AND NATIONAL LAWS—CONSTITUTIONALITY — CONSTRUCTION — LEX LOCI CONTRACTUS.

1. The act of the state of New-York of the 3d of April, 1811, is an insolvent and not a bankrupt law.

2. Distinction between insolvent and bankrupt laws.—Derived from England, where it has been long established. Those laws defined.

3. If the act in question, however, had been a bankrupt law, it would not have been void as repugnant to the constitution of the United States.

4. Presumption in favor of the constitutionality of state laws.

5. The existence of a power in the states to pass bankrupt laws, not incompatible with the powers delegated to congress for that purpose. The exercise of the powers of the latter would, however, suspend the powers of the former.

6. Importance of bankrupt laws to the larger commercial states, and probability that they intended to retain the right of making their own until congress could adopt an uniform system. Difficulties attending the adoption of such system.

7. Whether a general bankrupt law, including any classes besides traders, would be within the powers granted by the constitution to congress? Quere.

8. The constitutional provision that "no state shall pass any law impairing the obligation of contracts," does not apply to insolvent laws.

9. Difficulty attending the application of this provision.

10. Rules of constitutional construction.

11. History of the evils which led to the adoption of this and the like restraining provisions. Insolvent laws were not among those evils: on the contrary, they were esteemed beneficial.

12. Inference from the uninterrupted practice of some of the states in favor of the constitutionality of such laws.

13. Presumption that contracting parties, being aware of this practice, make their contracts with reference to it.

14. The retrospective operation of insolvent laws does not bring them within the constitutional provision.

15. Chronological account of the insolvent laws of New-York. No distinction in any of them between existing and future contracts.

16. The rule lex loci contractus does not apply to cases of discharge under insolvent laws.

[Cited in Cook v. Moffat, 46 U. S. (5 How.) 316.]

17. Meaning of this rule. Mischievous tendency of some dicta and decisions arising out of it, proceeding on a mistake in applying it as well to the remedy as to the construction and validity of the contract. Remarks on Smith v. Buchanan, [1 East, 11,] and other cases

18. Expediency and justice of insolvent laws.

19. The defendant made to the plaintiffs at Boston, Massachusetts, while they all resided there, several promissory notes, and afterwards

[1][Reported by Elijah Paine, Jr., Esq.]

removed to New-York, where he was discharged under the insolvent law of that state, of the 3d of April, 1811, which was passed after the making of the notes. Held that his discharge was a good bar to the action.

[20. Cited in Cooper Manuf'g Co. v. Ferguson, 5 Sup. Ct. Rep. 741, 113 U. S. 727, to the point that contemporary interpretation of a constitutional provision by a legislative enactment is entitled to great weight.]

At law.

H. D. Sedgwick and R. Sedgwick, for plaintiffs.

T. A. Emmet and J. D. Fay, for defendant.

Before LIVINGSTON, Circuit Justice, and VAN NESS, District Judge.

LIVINGSTON, Circuit Justice. This is an action brought on several promissory notes, made or endorsed by the defendant, then residing in Boston, to the plaintiffs, who were then and are yet residents of the same place. The notes are also made payable in Boston, and were dated prior to the passing of the insolvent law hereinafter mentioned. The defendant pleaded the general issue, and on the trial offered in evidence, pursuant to a notice given for that purpose, a discharge by the recorder of the city of New-York, dated the 13th of November, 1811, which was granted in virtue of an act of the legislature of the state of New-York, entitled "An act for the benefit of insolvent debtors and their creditors," passed the 3d of April of the same year. To the reading of this discharge the plaintiffs objected—but it was admitted. A verdict, however, was taken by consent, for the plaintiffs, subject to the opinion of the court on a case to be made by the parties. If the discharge was improperly admitted, judgment is to be entered on the verdict as it now stands; but if the discharge shall be thought a good bar to the action, the present verdict is to be set aside, and a verdict and judgment thereon entered for the defendant. The defendant, at the time of obtaining his discharge, resided and yet resides in the city of New-York. Few questions have ever been agitated in any court of the United States, since the formation of the federal government, of more extensive consequence, or of more delicacy than those which are now to be decided. When the binding force of an act of the legislature of any state is drawn into question for its supposed repugnancy to the federal constitution, although no court can entertain any doubt of its right to pronounce it invalid, yet it is no more than becoming to proceed with caution, and with more than ordinary deliberation. Presumptions will ever exist in favour of the law, for it will not readily be supposed that any state legislature, who are as much bound by the constitution, and are under the same solemn sanctions as the judges of those courts, to regard it, have

either mistaken its meaning, or knowingly transcended their own powers. If, then, by any fair and reasonable interpretation. where the case is at all doubtful, the law can be reconciled with the constitution, it ought to be done, and a contrary course pursued only, where the incompatibility is so great as to render it extremely difficult to give the latter effect, without violating some provision of the former.

The plaintiff's counsel, in support of the verdict, say, that the discharge which was given in evidence can be no bar to the action. They contend that the statute of New-York, under which it was obtained, is a bankrupt law, and as such, is void for its repugnancy to the constitution of the United States; and this position is supported by the broad assertion that every law which discharges the person and property, as well future as in possession of the debtor, is a bankrupt law. But to this definition the court does not assent; for this would be to confound at once almost all the distinctions between these laws, which have been known and recognized in England, from which country we borrow the term, from the first introduction of the system there, in the reign of Henry the Eighth, down to the present time; distinctions which must have been familiar to many of the members of the convention that made the constitution. It is not because these laws may, in some respects, produce the same effects, that they are not to be distinguished from each other. In England the bankrupt system has been confined exclusively to traders, and the creditors of traders; whereas the insolvent laws of this country embrace every class of debtors. It is of no importance whether the debt has been contracted in the way of trade or not, for a person to come within the purview of an insolvent law. So exclusively have bankrupt laws operated on traders, that it may well be doubted, whether an act of congress subjecting to such a law every description of persons within the United States, would comport with the spirit of the powers vested in them in relation to this subject.

But it is not only in the persons, who are the objects of these laws, that a difference exists, but their general and most important provisions are essentially dissimilar. Under a bankrupt law, the debtor is at once, by operation of law, as soon as he has committed an act of bankruptcy, divested of all his property, which is transferred to assignees in trust for his creditors. All dispositions by the bankrupt himself after this are void; an insolvent, on the contrary, retains the management of his own estate, however he may misbehave towards his creditors at large, and it is rarely, unless on his own application, vested in others. It is of no importance how many acts he may commit, which, under a bankrupt system, would enable his creditors to take from him the con-

trol of his property; they can seldom act upon him compulsively under the provisions of an insolvent law, if he be obstinate or dishonest, until he has given what preferences he thinks proper, and is become so poor as to be scarcely worth pursuing. Under the one system the creditors are actors, and under the other the debtor himself originates the proceedings; and if, as is sometimes the case, his creditors may do it, even then his consent is generally indispensable under the provisions of an insolvent system. Other differences, in almost every stage of proceeding, might easily be pointed out, but they are so familiar to the profession, that a bare inspection of the act under which this discharge was obtained, will leave no doubt on the mind of any one to which class it belongs. "The title proclaims it to be an act for the benefit of insolvent debtors and their creditors." The first section gives power to the insolvent himself, who is imprisoned on any civil process issuing under the authority of this state, to present his petition to a proper officer, praying that his estate may be assigned and he discharged from his debts. The residue of the act is principally made up of directions as to the proceedings which are to be observed after the presenting of such petition, until the final discharge of the debtor, all of which differ greatly from the proceedings which take place on the issuing of a commission of bankruptcy. The fourth section declares, that such "discharge shall extend to all debts due from him at the time of the assignment, or contracted for before that time, though payable afterwards." If this be not an insolvent law, the court is at a loss to say to what act this appellation can apply. The opinion which has been expressed on this point would seem to preclude the necessity of inquiring how far this law interferes with the authority given to congress to "establish uniform laws on the subject of bankruptcies;" but as the view which has been taken of the act of this state may be thought incorrect, the court has no objection to consider it, as though it were a bankrupt law. The power to pass laws of this character, it is said, is exclusively vested in congress, and whether they exercise it or not, no state can have a bankrupt law of its own. As a consolidation of the different states into one national sovereignty was neither effected nor intended to be effected by the constitution, it has always been conceded that the state governments retained so much of the power, which they before had, as was not by that instrument exclusively delegated to the United States. It is now indeed one of the amendments to the constitution, that the powers not granted to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people. It is agreed that such exclusive alienation of state sovereignty can only exist in three cases; where, by its terms,

it is so, or where a power is conferred on the federal government, and the states are prohibited from exercising a similar authority, or where an authority is granted to the former, to which the exercise of a like power on the part of the different states would be absolutely and totally contradictory and repugnant. It is not pretended that the grant of the power under consideration is exclusive in its terms, or that there is an express prohibition on the states from exercising a like authority; but it is supposed that such exercise would be so totally inconsistent with the one granted to the government of the Union as to be necessarily comprehended in the third class of exclusive delegation. If it be really so, that the passing of a bankrupt law by a state, to operate, as it necessarily must, within its own limits, be absolutely incompatible with the power vested in congress. it would be conceded at once, that such an act would amount to a violation of the constitution of the United States and be void. Let us see whether the counsel have succeeded in establishing this position.

It must be allowed by all, that at the time of making the constitution, each state had a right to pass insolvent and bankrupt laws. As it was desirable, in a country so extensive as the United States, and every part of which was more or less commercial, that the laws relating to bankrupts should be uniform, so also it was an object of great importance that none of the larger commercial states should at any time be without some code on this subject. A system of the first kind, that is, one which should be uniform throughout the Union, could not well be brought about but by delegating the power of rendering it so to congress. Great difficulties however would lay in the way of a statute, whose provisions should pervade the United States; and as these must have been foreseen, the states might be willing and desirous of retaining the right of passing laws of this nature. until congress could agree on a general plan. Nor can the court perceive any contradiction, absurdity, or repugnancy in these several powers existing at the same time in the general and in the state governments; in such subordination, however, that the exercise of the authority vested in the former should, for the time, suspend all exercise of the power which resided in the latter, and operate as a repeal of any laws which might have been previously passed by the several states. It is an uniform rule which congress are to prescribe. But if they furnish none, how is it an interference for each state to legislate for itself? Neither the terms nor spirit of the instrument are thus disturbed. It seems designedly to have been left optional with the general government to exercise this power, that if the embarrassments which lay in their way were insurmountable or very great, they might omit to do it, and

thus leave the states to take care of themselves. If it had been intended immediately to divest the states of all power on this subject, and to compel congress to act, the terms the terms of the article would have been much more imperative than we find them, and probably it would have been accompanied with a prohibition on the states. No writer on this part of the constitution has gone further than to say that the power of naturalization is exclusive; because, if congress have a right to ordain a general rule, the states can have no right to prescribe a distinct rule. This construction is supposed to follow, not from any inconsistency there would be in each state passing a naturalization act for itself, if congress did not bring into action the power delegated to them, but from the inconvenience to which it might subject some of the states, by imposing upon them as citizens, obnoxious foreigners. who might become naturalized in another state, without any previous residence, or without any regard to character, by the mere formality of taking an oath of allegiance.

If the argument ab inconvenienti applies to the case of naturalization, it has no bearing on that of bankruptcy; for, in this case, each state would be legislating principally for its own citizens. and other states could not be injured by any system it might adopt. But this construction, even in the case of naturalization, where the argument in favor of an exclusive power is much stronger than in that of bankruptcy, has not only been strongly controverted, but is opposed by a judicial decision entitled to no little respect. It is the case of Collet v. Collet. [Case No. 3,001.] in the circuit court of Pennsylvania. in which the three judges, one of whom had been a member of the federal convention, decided, after solemn argument, that the several states still enjoy a concurrent right with congress on this subject, "which. however, cannot, they say, be so exercised as to contravene any rule which congress in their wisdom may establish." The most strenuous advocates for the exclusive exercise of every unqualified power granted to the general government, seem not unwilling to admit the several states to a participation of such power, if it can be exerted consistently with, or without derogating from the express grant to congress. It has not been shown how a bankrupt act, passed by a particular state. can interfere with the exercise of a power residing elsewhere, to promulgate a uniform law for all the states. If similar powers had been granted to the government of the Union. respecting the descent of real estates, the recording of deeds, or the celebration of marriages, will it be said that the several states must have remained without any laws to govern the transmission of landed property, or that no deed could be acknowledged or recorded, nor a valid marriage solemnized, although congress might

for years omit to prescribe rules on these subjects? The object of this grant could have been no other than to place somewhere a power to correct the mischiefs which might arise from the different states passing on the same subject, not only dissimilar laws, but such as might be unequal in their operation on the citizens of other states. This end of the grant will be sufficiently and effectually attained, if, when the evil arises, congress bring into action the authority vested in them. From them only can a uniform system emanate; but systems, greatly varying, it is true, all of which, however, may be salutary, may be established without any derogation from or interference with a right residing elsewhere, to introduce uniformity on the same subject. Nay, from these very provisions, however discordant, might be selected materials for the one which it was committed to the general government to form. Neither can the passing of such laws by the states be regarded as a resumption of power by them, in which case, it is said, they should produce an express grant of it. This argument proceeds on the presumption of a previous relinquishment on the part of the states of all right to interfere in this matter, and is thus taking for granted what is the whole question in controversy; for, unless such transfer has been made, which is not admitted, no reassignment of it by the general government can be necessary.

No court of the United States will be suspected of feeling any disposition to countenance encroachments by the state legislature on the legitimate authority of the government of the Union; but in cases of doubt, and where the limits of separation are not very distinctly marked, and especially where the powers exercised leave in full force and unimpaired those given to the general government, the tranquillity and harmony of the Union will be better preserved by allowing to the states a reasonable share of legislation on the subject in dispute, than by strenuously insisting on a total exclusion. Congress themselves must have entertained an opinion, that the different states have this right in the present case; for on no other principle can we account for their leaving the United States so long without a uniform system of bankruptcy. Great and pressing as the call for such a system has been, the obstacles in the way of one that shall be uniform, and in that shape agreeable to all the states, continue to be so numerous, that but little hope is now indulged that any will be soon adopted; but great and serious as these difficulties may be, it would almost be the duty of congress to disregard them, if there existed no where else a power to correct the mischiefs which must necessarily be felt in many of the states from the non-user of this authority. The inference which has been drawn at the bar from this silence or inaction of congress, does not appear correct. It is considered as equivalent to an expression on their part of their sense against the wisdom and policy of all bankrupt laws, and that none ought to exist any where. Keeping in view the power which congress have, on this subject, it is more natural to interpret such silence into a declaration of their opinion of the inexpediency at present of any uniform system, and that the several states still retain the power which has been contended for, and can therefore take care of themselves. This would not be so great an imputation on their wisdom, as to suppose they can entertain an opinion in opposition to the sense of the whole world, that in a commercial state, such laws are mischievous or unnecessary. The opinion of the court, therefore, is, that this law, if a bankrupt law, would not on that account be void.

Another constitutional objection is made to the defense which is set up in this cause. The law under which this discharge was obtained, having passed subsequent to the date of the notes on which the action is brought, is supposed to "impair the obligation of contracts," and therefore to be void, either in the whole, or so far as it may extend to debts incurred previous to the passage of it.

There is not, perhaps, in the constitution any article of more ambiguous import, or which has occasioned, and will continue to occasion, more discussion and disagreement, than the one under which the present difficulty arises, or the application of which to the cases which occur, will be attended with more perplexity and embarrassment. Laws may be passed which so palpably trespass on this article as to leave no doubt on the mind of any man; others again will be of so questionable a character as to render it not very easy to form a satisfactory opinion concerning them. All the other restraints on the separate members of the confederacy, contained in this section of the constitution are conceived in terms so clear and intelligible, that rarely will any hesitation exist as to what will amount to violations of them; but to decide whether a law impairs the obligation of a contract, will generally be a task of some intricacy, and it will not be surprising if, in the discharge of it, great diversity of opinion should arise. This has been treated as a very plain case by both parties. By the plaintiffs we are told that it is the clearest case of a law impairing the obligation of contracts that can well be imagined; while the defendant contends that it is quite as certain that insolvent laws were never intended to be embraced by this provision of the constitution. The latter is the opinion of the court; but instead of regarding it, with the defendant's counsel, as a question of little or no difficulty, the court has not come to this conclusion, but after much hesitation, owing not only to its intrinsic difficulty, but be-

cause it is well known that the most respectable opinions to the contrary have been expressed elsewhere. The court will proceed to assign its reasons for the judgment which it has formed.

To arrive at the true meaning of any article of doubtful import in the constitution, a better mode cannot be adopted than the course which is generally pursued for the interpretation and understanding of ordinary remedial statutes: that is, to recur to the situation and history of the country at the time; to its contemporaneous exposition, if it has received any; and to the general understanding of the community, especially if such understanding shall have been long acquiesced in by all the states and all the courts of the Union. Keeping in view these rules, let us inquire what were the kind of laws to which this prohibition was principally designed to extend. There can be no doubt that by it was intended to be corrected some, if not all, of the evils which had crept into the system of legislation of many of the states, and had excited a considerable alarm for the security of private rights. In many parts of the Union all confidence in public faith was extinguished. This had been occasioned by frequent interferences on the part of some of the legislatures in matters which were not believed to fall within their ordinary and legitimate sphere of action. By recurring to the history of the times, and the reasons assigned by the friends of the constitution for the insertion of this article, much useful information will be obtained, and we shall be at no loss to discover to what species of laws it was then thought that the interdiction was principally supposed to extend.

During a long and arduous struggle for independence, much individual misery and distress were unavoidably produced. Driven from their homes, and cut off in many cases, from their ordinary pursuits, the resources of many were either exhausted, or so much impaired, as to induce the legislature, on various occasions, to listen to the pressing calls which were made upon them to devise some mode for their relief. Various expedients were accordingly resorted to, and the practice of interfering between creditor and debtor became so very extensive and so inconsiderate, as in many instances to place the former entirely at the mercy of the latter, and that too under laws which were apparently introduced with no other view than that of affording to the debtor a temporary relief from the pressure occasioned by the then situation of the country. Bills of credit, and paper money were issued, and by legislative sanction were substituted for gold and silver in the discharge of debts. Creditors in some places, were liable, without any adverse proceeding on their part, to be cited by their debtors, and to have the sums due to them tendered in a currency whose depreciation at the time pro-

duced the most glaring injustice. On their refusal to submit to this mockery of justice, the public securities, which had been thus offered, might be deposited with some public officer, and the creditor was for ever barred from any recovery. In other cases payments were authorized to be made by instalments. In some states the interest which had accrued during the war, or a part of it, was remitted, while elsewhere not only a paper currency of no value, but almost every species of property, was made a legal tender, and no stipulation however solemn, to pay in the precious metals, afforded any security to the creditor. The courts of justice in many of the states had been closed altogether, and the creditor thus withheld, at least for a time, from every appeal to the laws of his country, while his debtor might be squandering the property out of which his demand ought to have been satisfied. Geographical limits had also been resorted to, for the purpose of introducing the most odious discriminations between creditors themselves. For those who resided within the British lines, and those who were without those precincts, distinct remedies were prescribed, and the scales of justice so unequally graduated, that while the latter might recover the whole of their demands, the former, if they sued, were compelled to receive public certificates of one description or other, of so little value, as scarcely to indemnify them for the costs of suit which they were obliged to pay. Very great liberties had also been taken with British creditors, many of whom complained, and too justly, of the impediments which continued to be thrown in their way, even after the return of peace. These frequent interpositions in private concerns, during a period of great public and private suffering, and for many of which the condition of the country and the great object at stake, might seem to offer some apology, became so common, so intolerable, and so inveterate, in many places, that it became no easy matter, even after the restoration of peace, and the acquisition of our independence, to lay them aside. There will, therefore, be found in the statute books of several of the states, after the termination of the war, many provisions of the same meddling and obnoxious character, which either changed the nature of contracts, or suspended the payment of them, or authorized it in a way contrary to the plain engagement and meaning of the parties.

By laws of this description, which had become too dangerous and oppressive to be any longer borne, very extensive and great uneasiness was produced, and against them was raised a corresponding and almost universal expression of indignation and regret. Accordingly, to all the objections made against the prohibition, on the part of the states, to pass laws impairing the obligation of contracts, we find the friends of the

constitution every where, and again and again, urging the necessity of it, in order to put an end to the evils which had flown from acts of the kind which have been mentioned, and which had, after the Revolution, been extended by designing and influential men, to many other cases, so as to increase, instead of diminishing, the alarm which had been excited. To such acts we find them constantly ascribing the decay of commerce, the ruin of public credit, and the almost entire extinction of confidence between individuals, and pressing with vehemence the adoption of this article as one of vital importance, and as the only guard and preventive against the promulgation by future legislatures of similar acts in derogation of private rights, however great the emergency might be deemed. But on no one occasion do we hear of any complaints against the power of passing insolvent laws. This practice had not arisen out of the calamities of war; it was brought with the first American colonists from the mother country; it was adopted, in one form or other, by all the British colonies in North America, without an exception that has been discovered as to any one which now composes a part of the United States. It must have originated, wherever we find the practice of it, and perhaps it is not hazarding too much to say, that it is universal, not only from a conviction that the encouragement of trade required it, and so are the recitals to many of the acts; but from those indelible principles which are implanted in the breast of every man, and which proclaim, in a language not to be misunderstood, that in every country where imprisonment for debt is allowed, there must and ought to reside a power somewhere of compelling creditors to abandon their hold of the body of a debtor, who shall fairly, and under such restrictions as the law may provide, make a complete surrender of his property, to be divided amongst those whose debts some unexpected turn of fortune has rendered him unable to pay. In such cases, his future acquisitions, although here there may exist some diversity of opinion, should also be his own, or he will be restored to his freedom and family, not only without property, but without credit, and in many cases with such a heavy load of unextinguished debt, and so many liens on his future acquisitions as must stifle every exertion to make any. His freedom, in such cases, will be a mockery, nor will such a state of servitude to his creditors often prove of any service to them; for, sinking under a burden from which he sees no prospect of relieving himself, his ambition and efforts will be limited to the gaining of a bare maintenance for himself and family, knowing that neither he nor they can ever be benefitted by any surplus.

But whatever considerations may have first called into practice a power of this kind, it is sufficient for our present purpose, that we find it in use in perhaps every state of the Union, under some modification or other at the time of the adoption of the constitution, and that the laws passed on this subject very generally, if not universally, provided not only for future cases of insolvency, but for those which existed at the time. If this be so, and that it was so to a very great extent is not denied, it must have been known to the friends of the constitution, who exerted themselves in favour of its adoption; and yet no arguments drawn from that source are to be found in the debates of any of the conventions, in favour of the prohibition. Nor is it recollected, that those who were hostile to its adoption, ever objected to this feature of it, because of its liability to such construction: and yet such objections would have been heard from more quarters than one, if it had then been thought susceptible of the interpretation which the court is now expected to apply to it. It may also be observed, that if it had been thought necessary at that time of day to tie up the hands of future legislators in relation to this matter, it would have been more natural to have committed to congress a power of establishing a uniform system of insolvency as well as of bankruptcy, or to have transferred to the general government an unqualified and express power in the premises; for it cannot be credited that a people who had been so long accustomed to laws of this kind, would have consented to deprive the state legislatures of the power of passing them, without at the same time delegating to that of the Union some control over the same subject. Dissatisfaction may have existed and been expressed at the abuses which were committed under the sanction of such laws, for not more effectually protecting creditors against the frauds of their debtors, and such dissatisfaction is often heard at the present day; but never was the right or propriety of an interference in this way called in question.

To the practice of the states antecedent to and at the epoch of the adoption of the constitution, and to the silence on this head of those whose attention was directly called to this article, may be added the uninterrupted and undisputed usage of all or most of the states from that day down to the present time. Yet after the lapse of near thirty years, during which time scarcely a chasm or intermission is to be discovered in the usage of the state where the court is now holding, it is called upon to pronounce all its insolvent laws, so far at least as they operate on past debts, and all discharges under them of such debts, as repugnant to the constitution, and therefore void. Without adverting to the serious consequences of such a decision, with which the court has nothing to do, how, it may be asked, is the uniform practice which has been mentioned to be accounted for, but

from a general and universal understanding that such practice was no departure from any of the obligations which one state had contracted with the others? Can we believe, that before time was allowed to organize the general government, and while the instrument of its formation was undergoing the examination and criticism of able and industrious adversaries, any state could have passed laws of this character, not only without animadversion, but execute them without any objection from a numerous class of citizens who are in general not the most inattentive to, or ignorant of, their rights? Would not a clamour on the part of creditors have been heard from one extremity of the Union to the other, against such an usurpation of power, if it had been viewed in that light? And if the legislatures of the several states could not have been brought back to a sense of duty by remonstrances against the exercise of such a right, would not applications have been made to the courts of justice, to arrest by their decisions the progress of such gross and frequent violations of the constitution?

But not only have these laws been passed without a constitutional difficulty being ever suggested by any member of the legislature, at the time, but frequently as they must have been, brought to the notice of the courts of the different states, and sometimes of the federal judiciary. It is not until very recently that the present objection has been heard of. Congress too, in the only bankrupt law which they ever passed, introduced a provision, that it should not "repeal or annul the laws of any state, then in force, or which might thereafter be enacted for the relief of insolvent debtors;" many, if not all of which then in force, will, on examination, be found to be retrospective. Either then, these laws are not within the prohibition, or if they are, and the terms of it are so obscure as to have hitherto eluded the research of so many who must have had an interest in its discovery, it is the very case in which a court ought to rely for its true sense on a general practice which has been so long submitted to.

It has been said that a practical construction is of no importance when a question arises on public acts of so important and solemn a nature as a written compact between several independent states. The instrument, it is said, should speak for itself. But if there be anything in this remark, a decision of the supreme court of the United States, on the effect of a practice in fixing the meaning of the constitution, would not permit the court to listen to it. In the case referred to, a usage of only ten or twelve years, and which had once been interrupted by an act of congress, was deemed to settle a question, in which was involved the very independence of an important and co-ordinate member of the federal government, and that too in opposition to what, many will think, as probably did the judges themselves who decided it, the plain and obvious letter and spirit of the

constitution. But, aside from this contemporaneous and universal expression of public and private sentiment on this subject, the court is not very certain that it would have regarded a law of this nature, if the question were of earlier date, as "impairing the obligation of contracts." This objection goes only to such of these laws as affect antecedent contracts. It may very safely be assumed, that most, if not all of the insolvent laws of this country, fall within this description, and an interposition by the legislature in this way seems absolutely necessary, if not inevitable, wherever imprisonment for debt is allowed. Such laws cannot therefore be regarded as contrary to the first principles of the social compact, or opposed to those sound and wholesome rules of legislation which were intended to be preserved pure and inviolate by those who made the constitution. A power to pass such laws necessarily results from the antecedent state of things, and from the existence of a system, which, if left to itself, without occasional controls on the part of the legislature, would produce permanent individual distress and ruin, and to an extent, highly injurious, not only to the state itself, but to the very parties, who might, in the moment of passion or disappointment, resort to it as a means of coercion. This attribute of sovereignty, for as such it is regarded by the court, it was better that the states should retain, than to have relinquished it to the federal government. By the former it would be exercised within a less extended sphere, and of course with not so much danger of injury to the parties concerned, as if the same duty had been performed by the congress of the United States. If then the passing of laws affecting in this way, past as well as future debts, has been in use within this state ever since its independence, and for many years while a colony, and if such practice has not only been acquiesced in, but was absolutely necessary, may it not be fairly presumed that every contract within this state, or to be enforced here, is made under a full knowledge of such practice, which must now be deemed a perfect right; and that this being known and understood by both parties at the time, the creditor has no right to complain if his debtor shall one day be liberated by virtue of an insolvent law which may be in force at the time of the contract, or which may be afterwards passed; not from the obligation or payment of the debt; but from personal confinement, on condition of making payment as far as he is able?

The court has proceeded on a belief, that most, if not all, of the states had been in the habit of extending their insolvent laws to all debts without any regard to the time of contracting them. Time has not been afforded during a very busy term to examine the statutes of the different states, even if they had been within reach of the court, to see if there were any exceptions. There may be

some difference in these laws, as to the mode of proceeding, and in the effect of a discharge obtained under them. In some cases, the debtor is alone the actor in obtaining it; in others, a part of his creditors unite with him; by some again the person only is exonerated, either from all his creditors, or from those who have sued him. By others, all future acquisitions as well as the body are placed out of the reach of the creditors; but the principle on which they proceed is the same in all, that is, a right in the legislature to relieve insolvent debtors from imprisonment by some general law. The degree of interference is of no importance as it affects this question. Every kind of interference, however limited in degree, must, on the principle on which the plaintiffs rely, be a violation of the constitution. If these laws had been of the odious character which is now attached to them, is it not probable that at least some one state would have checked the further enacting of them by an article in the bill of rights prefixed to its constitution? No such limitation however is to be found, nor any expression bearing on the subject.

Referring those who may wish to pursue the inquiry for the laws of the other states on this subject to their several statute books, the court will only notice some of those which have been passed by the colony and by the state of New-York. In 1755 a general act for the relief of insolvent debtors was passed. In May, 1761, another passed requiring the assent of three-fourths of the creditors in value, which expired in 1770. From that time until 1784 no general system was in force, but many acts were occasionally passed for the relief of individuals. In 1784 a general system was again adopted similar to the one which had expired in 1770. In 1788, another general insolvent law passed. This was revived in 1801. In April, 1811, the law passed, under which the present discharge was obtained, which permittted the debtor alone to petition, without the concurrence of any creditor. In 1812, the last law was repealed, and the consent of three-fourths of the creditors again required. In 1813, the system now in force was adopted which requires the co-operation of two-thirds, instead of three-fourths, of the creditors. By not one of these laws are debts previously contracted, excepted from its operation. Let it also be remembered, that frequently as the attention of the council of revision of this state, composed of the governor, chancellor, and judges of the supreme court, has been called to this subject, this objection has never occurred to them, watchful and able as they ever have been to discover and check every aberration in the legislature from a correct and constitutional course of duty.

But if it be on account of their relation back, that insolvent laws are regarded as impairing the obligation of contracts, bankrupt laws are liable to the same objection; and such was the character of the only one which congress ever passed. Now, although there be no constitutional restraint in terms, on that body, from passing laws interfering with private contracts, it is not to be presumed they would, knowingly, give their sanction to any act of this kind. Nor, even in passing a bankrupt law, would they have done it in a form liable to so serious an imputation, if they had believed they were impairing the obligation of contracts, especially as that power might have been exercised free from every objection of this nature. This is some proof that laws of this description are not regarded by congress as any violation of contracts, merely on account of their retrospective influence.—The contract in truth remains in full force, while payment thereof by the policy and humanity of most civilized nations must, in case of misfortune, be sought for out of the estate of the debtor, who, as well as his future property, is, in general, released.

After all that has been said, the court considers this question as one of considerable difficulty, and regrets that it has not yet received a decision at Washington, which would produce uniformity of judgment; at least in the courts of the United States.

But if these constitutional objections are removed, it is alleged, that the contract being made and being payable in Boston, cannot be affected by any discharge obtained under the laws of the state of New-York. Under this head of argument the court has been reminded of a rule, which, it is presumed, when properly understood, will be acknowledged by every one; that is, that the lex loci contractus must be resorted to, in order to ascertain the meaning of every agreement made abroad. This does not proceed from mere comity or courtesy towards other nations, but from the immutable principles of justice, which would be violated by applying to a foreign contract, when deciding on its obligation and effect, any other law than that of the place where it was made—for how palpably unjust would it be for this court to pronounce void, a bond executed at Canton and payable there, because by it should be reserved a greater interest, which might be lawful there, than seven per cent. per annum, which would render it usurious in this state? This is the meaning of the rule, and it is a salutary and just one. But out of it have arisen some dicta, which are ripening very fast into decisions of the most mischievous tendency, and between which and the rule itself it is difficult to perceive any connection. It has been said that, as the nature and validity of a contract must be settled by the law of the place where it was made, so, also, it cannot be affected by any discharge of the debtor under the bankrupt or insolvent laws of the place where he resides, or of the country to which he belongs; or in other words, that a contract, made in a foreign state,

and with a view to its code, can only be discharged pursuant to, that is, as the rule is now applied, under the bankrupt laws of such state.—Accordingly, suits have recently been maintained against bankrupts and insolvents, whenever they have been arrested by process out of the court of any other state than the one in which they became so. Thus a citizen of Pennsylvania has not been permitted to sue in New-York a debtor who may reside, and have been liberated under a law of the latter state; but if he can be found in Massachusetts, or elsewhere, his certificate, it is said, will be of no avail, provided the contract were made in Philadelphia, or elsewhere in the commonwealth of Pennsylvania. This is not exactly the case here, but as these decisions are supposed to have a considerable bearing on it, the court will be expected to express an opinion on them. It has no hesitation in saying, that it considers them as forming part of a class of cases, which, it will one day be lamented should ever have found their way into the commercial code of this country. They appear to proceed on a misapprehension of the rights of independent nations; but principally on a mistake in applying the lex loci contractus, as well to the remedy, as to the construction and validity of the agreement, contrary to all the adjudged cases on this head. They maintain that a debtor can never, under any circumstances, be discharged against the will of his foreign creditors, if his contracts with them be made where they reside, and with a view to the laws of their country, by any proceedings under the insolvent laws of the state of which the debtor is a member, but only by a certificate obtained pursuant to the bankrupt system, if any such there be, of the several countries in which his creditors may happen to reside. If the rule be not laid down precisely in these terms, such are its import and effect, and such, or something like it, is the practice which is very fast introducing itself, under the sanction of it. If this be so, how is an American merchant, who may be indebted in several countries abroad, in case of misfortune, ever to get disentangled from his debts? No proceedings under the bankrupt laws of the United States, if there be any, nor in conformity with the insolvent provisions of his own state, can do him any good. If he remains in his own country, trusting to the validity of such proceedings, perpetual imprisonment must be his doom, if his foreign creditors shall be as unrelenting as this rule is well calculated to render them; for no power there, it is said, can relieve him against this class of demands, but upon full payment of them, without a violation of the contract made abroad, or a disregard of the comity, due from one nation to another. According to this doctrine, he has no alternative left, but that of going to the different countries where he may be indebted,

and there submitting to the proceedings established for the relief of unfortunate traders. And yet it is not perceived how his foreign creditors will be gainers by exposing him to so great a hardship; for if he shall commence his career of insolvency, as he naturally will do, in his own state, the assignment of his estate made there, will leave nothing for the creditors abroad, it being admitted, that by it the whole of his property, wherever it may be, will pass. In like manner, a debtor who shall fail, and have creditors of this description in different parts of the Union, will have to make a tour of the United States before he can commence business again, in order to seek relief under the insolvent system of each state. It is not more reasonable to suppose, as the case most undoubtedly is, that every contract, wherever made, must proceed on an expectation, that the parties shall perform it according to the terms, if they are able, but if there shall be an inability in either to fulfil his part of the agreement, that then the other party shall be placed on as good, but not on a better footing, as to any remedy which he may seek for its breach or non-performance, as those who may reside in the country of the debtor? This, in case of insolvency, I should regard as a performance of the contract, secundum legem loci contractus, unless it were shown, that some different stipulation in the event of insolvency had been entered into, which is not pretended, and probably never did form a part of any contract, where no specific security was taken; and if it did, would hardly be enforced to the prejudice of other creditors.

If a remedy against the person of an insolvent debtor be allowed to his creditors abroad, which is denied to a domestic creditor, what is it but to give the former a preference over the latter, which neither justice will sanction, nor the lex loci in any case expect? On this subject I had an opportunity of expressing an opinion many years ago, in one of the cases which has now been cited. To that opinion I adhere, and shall adhere until a different rule shall be presented by a tribunal which has a right to control and direct the judgment of this court. I then stated, that a surrender of all the bankrupt's effects, under the laws of the state in which he permanently resided, ought to operate as a discharge from his creditors in every part of the world; and will now add, without any regard to the court or country in which the action against him may be prosecuting. Whatever fault may be found with this opinion, I am mistaken if it will not be found to conform with the sentiments and practice of commercial men, and to be for the benefit of trade, that it should be so. Merchants generally believe, that if their debtors abroad, no matter how the debt was contracted, or when payable, be regularly discharged by the

bankrupt, or any other law of the state in which they reside, and his estate be divided among all his creditors, they are exonerated every where. The rule so often cited from Huberus and Casaregis, has no application to such a case. When the latter speaks of contracts territorial and exterritorial, it is most manifest that he means nothing more, than that a contract made in one country is not to be construed by the laws of another. Now the difficulty is, to find out what the lex loci contractus has to do with the case of a future insolvency, or how the law of one country can differ from that of another in this respect. It is presumed to be law every where, that a man is to pay according to his contract; but if he be unable to pay any where, what then has the lex loci to do with the case? Is it part of that law, or is it any part of the contract, express or implied, that no government upon earth shall be allowed to interfere for his protection in case of misfortune and insolvency; or if it does, that such protection shall not extend beyond the limits of the state in which he lives, and not even there, as is contended in this case? Is it not for the advantage of foreign creditors, and will it not comport better with the interest of all parties, that when an insolvency occurs, they shall be placed on an equal footing with domestic creditors? It may be ruinous to the debtor, but of what advantage will it be to his absent creditor, to have him consigned to a prison during life, without any right to a participation on his part, in the property in the hand of assignees; for it has not yet been pretended, although this might as well be proved by the lex loci, that the creditor abroad has a right to a dividend of his estate, and to the body of the debtor in the bargain. If care be not taken, the great solicitude which has recently been discovered for creditors in other countries, will produce decisions, if such have not already been made, which, in case of bankruptcy, will do them more harm than good. The truth is, all that amity, good faith, the contract of the parties, and the lex loci, if it has anything to do with the question can require, is, that their interests and rights shall not be postponed, or in other words, that they shall be as well taken care of as those of other creditors. Yet the court of king's bench, in Smith v. Buchanan, [1 East, 11,] went on the sole ground of the lex loci, when it decreed on the inefficacy of a discharge in Maryland against the claim of a British creditor. "It is impossible," says Lord Kenyon, "that a contract made in one country is to be governed by the laws of another." It is also remarked in this case, that it might as well be contended, that if the state of Maryland had enacted that no debts due from its own subjects, to the subjects of England, should be paid, the English creditor would be bound by it. A law of this kind would not have been enforced

by any court of this country; but between the iniquity and injustice of such a statute, and one which placed the British on a level with the American creditor, this court perceives no resemblance; while the one is calculated to excite the just indignation of any man, the other is well entitled to universal approbation. If, in all its provisions, it did not resemble the bankrupt laws of England, its effect in producing an equal division of the insolvent's estate was the same. It ought not to pass unnoticed that at the very moment of rendering this judgment, the court admits that an assignment under the act of Maryland, would vest the property of the bankrupt, wherever it might be, in his assignees. If so, it would seem to follow, that the debtor himself ought to be discharged; for, if the law takes from him, and against his consent, his property every where, and secures it even from the pursuit of a foreign creditor, why should it not be allowed to offer a protection equally extensive to his person? Or, why should he be placed in the very awkward situation of being liable to imprisonment abroad, when, in that very country, he may have more than property enough to satisfy the demands of his foreign creditor, but which has been placed out of his reach by an assignment previously made under the laws of his own state? And it may here be remarked, that the universal effect which is given to such assignments is not among the least of the advantages which foreign creditors derive from the bankrupt or insolvent laws of the country where their debtors reside. It prevents the creditors near him, and who will be first apprized of his misfortunes, and of the nature and situation of his property, from laying attachments on many parts of it, to the prejudice of those at a distance. This case will be dismissed with only one other observation. The merchants of the United States have never supposed that they can proceed in their own courts against British bankrupts, if found here, merely because the debt may have been contracted and payable on this side of the Atlantic; they receive and are satisfied with the dividend made in England; but if they shall hereafter make the attempt and succeed, it is to be hoped that the court which shall sustain so novel a pretension, will have more courtesy than to compare the bankrupt laws of England, which are perhaps as perfect as such a system can well be, with an act of parliament, which should prohibit to American citizens the recovery of their just demands against British subjects. In the case of Van Raugh v. Van Arsdaln, [3 Caines, 154,] in the supreme court of this state, we are only told that the question had been decided ten years before, but what the case referred to was, or on what ground the decision was placed, does not appear. In Smith v. Smith, [2 Johns. 235,] however, the court refers to the decision in 1 East, and

assigns the same reason that is there given, and which has already been remarked on.

But this court is desired and expected to advance one step beyond all the decisions which have yet been made on this subject. Hitherto, an unfortunate debtor, even if he had heard of the few cases which have been mentioned, might think himself safe if he would confine himself within the limits of his own state. He might confidently expect protection against the pursuit of every creditor without regard to his place of residence, or to the spot where the contract was to be performed. But even this security from imprisonment is now desired to be withdrawn from him, and this course of conduct is pressed on the court, not on the footing of a series of adjudged cases from which there might be no escape; for none such are produced; not because it will accord with the general sense of the commercial world; for that, it is believed is directly opposed to it. Not because of any odious discriminations which are found in the insolvent laws of this state, between territorial, or extra-territorial creditors; for they are placed on a perfect equality. Not because the interests of commerce will be advanced by it; for in such a state of things, none but men of the most enterprising character will dare to engage in it. Nor yet because other countries practise on this rule; for nothing resembling it is pretended to be in use in any other part of the globe. Nor is it to be believed that the court of king's bench itself, notwithstanding the solitary case which has been produced as to a discharge abroad, would disregard a plea of bankruptcy by a British debtor, against the claim of any foreign creditor, whatever might be the place of contract or of payment.

The court having already expressed its opinion on the inapplicability of the lex loci contractus to all cases of this kind, will only add, that this rule has performed its office, when a construction is given to the contract according to such law; but in case of inability to pay, a new state of things occurs, the only proper rule to govern which is, that care be taken to enforce an equal and fair distribution of an estate, under the laws of the country in which the debtor has his residence.

Insolvent laws have been harshly and not very correctly compared by the plaintiff's counsel, to laws authorizing the payment of a debt with one cent in the dollar, and in a way and at a time different from the agreement of the parties. They do no such thing; they afford a sanction to no injustice; they violate no law human or divine; they leave the obligation of parties in full force; they create no inability, nor interfere between one who is able to pay, and his creditors: but when such inability intervenes, they step in and take care, or at least such is their object, that a complete surrender of the debtor's estate shall be made for the benefit of all his creditors; and when this is done, they compel the latter to observe towards him that mercy and forbearance which, in similar circumstances, they would wish and expect to have extended to themselves.

It seemed to be admitted on the argument, that if foreign creditors had been named in this act, they would have been barred. The court thinks them as much bound by the general and comprehensive terms of this act, as if they had been specially designated. Enough has already been done in their favor, without clothing them with a prerogative not yet heard of; that of being exempt from every law, unless particularly named. Nor is this the ground on which these decisions go. It is, that a state has no right to pass laws to discharge its insolvent subjects from debts due abroad. But if the court has erred in the principles which it has adopted, or in the application of them to foreign creditors in general, the plaintiffs have no right to complain; for when a citizen of Massachusetts, where they reside, is imprisoned, at the suit of a citizen of this or any other state, he can, under the laws of that commonwealth, obtain his discharge as to his person at least, without the creditor's consent; and such discharge is regarded, as it ought to be, as binding on all the courts of that state.

Sitting, therefore, in the state which passed the insolvent act in question, and to which no constitutional objection appears, this court is not sensible that it departs from a single adjudged case in England, or in this state, when it decides on the universal validity of a discharge obtained under it.

Upon the whole, this court is of opinion, that the act of the 3d of April, 1811, is an insolvent, and not a bankrupt law—that, if it be of the latter description, the several states have a right to pass bankrupt laws for themselves, until congress shall establish a uniform system on the subject—that an insolvent act extending to past, as well as future debts, is not a law "impairing the obligation of contracts," within the meaning of the constitution—and that a federal court, sitting within this state, is bound to support a discharge under such law, against the claim of a foreign creditor, although the debt due to him may have been contracted (and made payable at the place of residence.)

The present verdict must, therefore, be set aside, and a verdict and judgment entered for the defendant.

NOTE, [from original report.] Since the question of the constitutionality of the state insolvent laws has been raised, the supreme court of the U. S. has settled the following principles, which are, of course, the law of the land. In Sturges v. Crowninshield, which was decided at the February term, 1819, 4 Wheat. [17 U. S.] 122, the court held, that until the power to pass uniform laws on the subject of bank-

ruptcies be exercised by congress, the states are not forbidden to pass a bankrupt law, provided it contains no principle which violates the 10th section of the first article of the constitution of the United States—That insolvent laws which discharge the person of the debtor, but leave his obligation to pay in full force, are not repugnant to the 10th section—And that a discharge of a debtor under the act of the state of New-York, of the 3d of April, 1811, from a contract made in New-York before the passage of the law, the creditor then residing in Massachusetts, and not having proceeded to execution against the body of his debtor in New-York, was void by the 10th section. In M'Millan v. M'Neill, Id. 209, the debt was contracted in 1813, in South Carolina, the debtor and creditor both residing there, and the discharge was obtained in Louisiana, whither the debtor had removed, in 1815, under a law of the state, passed in 1808. The court held, that "this case was not distinguishable from that of Sturges v. Crowninshield; and that the circumstance of the state law, under which the debt was attempted to be discharged, having been passed before the debt was contracted, made no difference in the application of the principle." It will be observed, that the court do not notice the circumstance that the contract was made in South Carolina, where the parties then resided. In Farmers' & Mechanics' Bank of Pennsylvania v. Smith, 6 Wheat. [19 U. S.] 131. the court held, that a discharge obtained in Pennsylvania in September, 1812, under an act of that state, passed the 13th of March of the same year, from a contract made in Pennsylvania in 1811, the contracting parties at all those times being residents of that state, was void. The case of a discharge under the law of a state, where the contract was made within the state, between residents of the state, and after the passage of the law, has not yet been decided. Such a case is, however, pending, and has been argued, and is held under advisement and for a further argument at the next term.