## ASHTON ET AL. *v.* CAMERON COUNTY WATER IMPROVEMENT DISTRICT NO. ONE.

No. 859. Argued April 29, 1936.—Decided May 25, 1936.

*Mr. Palmer Hutcheson,* with whom *Messrs. J. W. Terry* and *W. P. Hamblen* were on the brief, for petitioners.

516

518

*Messrs. David M. Wood* and *W. B. Lewis* for respond-
ent.

520

Messrs. *Stephen W. Downey, Harry W. Horton,* and *George Herrington,* on behalf of the Merced Irrigation District of California, et al.; *Mr. Charles D. Frierson,* on behalf of Drainage District No. 7, Poinsett County, Arkansas; *Messrs. R. L. Ward* and *Charles Claflin Allen, Jr.,* on behalf of Drainage Districts Nos. 6 and 8, Pemiscot County, Missouri, et al.; *Mr. C. F. Metteer,* on behalf of Reclamation District No. 1,000, of California, et al.; *Mr. John D. McCall,* as bond counsel for several water improvement districts in Texas; *Messrs. Harvey Roney, George D. Beardsley, Harry L. Donnelly,* and *Martin E. Lawson,* on behalf of Birmingham Drainage District, Clay County, Missouri; and *Mr. George M.*

*Corlett,* on behalf of irrigation districts in Colorado—all in support of the validity of the Act.

*Messrs. Herman Phleger* and *Maurice E. Harrison,* and *Messrs. James N. Gillett, W. Coburn Cook, A. Heber Winder, Henry W. Coil, Ross T. Hickcox,* and *Charles L. Childers,* on behalf of creditors of irrigation districts, challenging the validity of the Act.

*Solicitor General Reed* and *Messrs. James B. Alley, Max O'Rell Truitt, Hans A. Klagsbrunn, Warner Gardner,* and *William Radner,* on behalf of the Reconstruction Finance Corporation.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

Respondent, a water improvement district embracing 43,000 acres in Cameron County, Texas, was organized in 1914 under the laws of that State. Claiming to be insolvent and unable to meet its debts as they matured, it presented to the United States District Court, December 5, 1934, an Amended Petition with plan for adjusting its obligations—$800,000 six percent bonds. This proposed final settlement of these obligations through payment of 49.8 cents on the dollar out of funds to be borrowed from the Reconstruction Finance Corporation at four percent.

The petition follows and seeks relief under the Act of Congress approved May 24, 1934, c. 345, §§ 78, 79 and 80, 48 Stat. 798; Title 11 U. S. C., §§ 301, 302 and 303.* It alleges that more than thirty percent of the bondholders had accepted the plan and ultimately more than two-thirds would do so. The prayer asks confirmation of the proposal and that non-assenting bondholders be required to accept it.

Owners of more than five percent of outstanding bonds appeared, said there was no jurisdiction, denied the ex-

* Originally, this was limited to two years. By Act approved April 10, 1936, it was extended to January 1, 1940, c. 186, 49 Stat. 1198.

istence of insolvency, and asked that the petition be held insufficient.

The trial court dismissed the petition for lack of jurisdiction. It held—

The petitioner is a mere agency or instrumentality of the State, created for local exercise of her sovereign power—reclamation of arid land through irrigation. It owns no private property and carries on public business only. The bonds are contracts of the State, executed through this agency, and secured by taxes levied upon local property. Congress lacks power to authorize a federal court to readjust obligations, as provided by the Act. Also, the allegations of fact are insufficient.

The Circuit Court of Appeals took the cause, considered the points presented, and held that the allegations were adequate to show jurisdiction and to warrant introduction of evidence. Also that Congress had exercised the power "To establish . . . uniform Laws on the subject of Bankruptcies," granted by § 8, cl. 4, Art. 1 of the Constitution. Accordingly, it reversed the trial court and remanded the cause.

The Act of May 24, 1934 amended the Bankruptcy Act of July 1, 1898, c. 541, 30 Stat. 544, by adding Chapter IX (three sections, 78, 79, 80), captioned "Provisions for the Emergency Temporary Aid of Insolvent Public Debtors and to Preserve the Assets thereof and for other Related Purposes."

Section 78 asserts an emergency rendering imperative further exercise of the bankruptcy powers. Section 79 directs that "in addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, courts of bankruptcy shall exercise original jurisdiction in proceedings for the relief of debtors, as provided in this chapter."

Section 80—long and not free from ambiguities—in twelve paragraphs (a to l) prescribes the mode and con-

ditions under which, when unable to pay its debts as they mature, "any municipality or other political subdivision of any State, including . . . any county, city, borough, village, parish,. town, or township, unincorporated tax or special assessment district, and any school, drainage, irrigation, reclamation, levee, sewer, or paving, sanitary, port, improvement or other districts" may effect a readjustment. A brief outline of the salient provisions, with some quotations, will suffice for present purposes.

The petition for relief must be filed in the District Court and submit plan for readjustment approved by creditors holding thirty percent of the obligations to be affected; also complete list of creditors. If satisfied that the petition is in good faith and follows the statute, the judge shall enter an approving order; otherwise, it must be dismissed. Creditors holding five percent of the indebtedness may appear in opposition.

"A plan of readjustment within the meaning of this chapter (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; and (2) may contain such other provisions and agreements, not inconsistent with this chapter, as the parties may desire."

Upon approval of the petition, creditors must be notified; if the plan is not seasonably accepted, extension may be granted, etc.

Hearings must be accorded. The judge, with its approval, "may direct the rejection of contracts of the taxing district executory in whole or in part." He may require the district to open its books; allow reasonable compensation; stay suits; enter an interlocutory decree declaring the plan temporarily operative, etc. "But [he] shall not, by any order or decree, in the proceeding or otherwise, interfere with any of the political or govern-

mental powers of the taxing district, or any of the property or revenues of the taxing district necessary in the opinion of the judge for essential governmental purposes, or any income-producing property, unless the plan of readjustment so provides."

After hearing, the judge shall confirm the plan, if satisfied that it is fair, equitable, for the best interests of the creditors, does not unduly discriminate, complies with the statute, and has been accepted by those holding two-thirds of the indebtedness. Also, that expenses incident to the readjustment have been provided for, that both plan and acceptance are in good faith and the district is authorized by law to take all necessary action.

. The provisions of the plan, after order of confirmation, shall be binding upon the district and all creditors, secured or unsecured. Final decree shall discharge the district from all debts and liabilities dealt with by the plan, except as otherwise provided.

"(k) Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any political subdivision thereof in the exercise of its political or governmental powers, including expenditures therefor, and including the power to require the approval by any governmental agency of the State of the filing of any petition hereunder and of any plan of readjustment, and whenever there shall exist or shall hereafter be created under the law of any State any agency of such State authorized to exercise supervision or control over the fiscal affairs of all or any political subdivisions thereof, and whenever such agency has assumed such supervision or control over any political subdivision, then no petition of such political subdivision may be received hereunder unless accompanied by the written approval of such agency, and no plan of readjustment shall be put into temporary effect or finally confirmed without the written approval of such agency of such plans."

We need not consider this Act in detail or undertake definitely to classify it. The evident intent was to authorize a federal court to require objecting creditors to accept an offer by a public corporation to compromise, scale down, or repudiate its indebtedness without the surrender of any property whatsoever. The Act has been assailed upon the ground that it is not in any proper sense a law on the subject of bankruptcies and therefore is beyond the power of Congress; also because it conflicts with the Fifth Amendment. Passing these, and other objections, we assume for this discussion that the enactment is adequately related to the general "subject of bankruptcies." See *Hanover National Bank* v. *Moyses,* 186 U. S. 181; *Continental Illinois N. B. & T. Co.* v. *C., R. I. & P. Ry. Co.,* 294 U. S. 648; *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555.

The respondent was organized in 1914 as Cameron County Irrigation District No. One, to furnish water for irrigation and domestic uses; in 1919, it became the Cameron County Water Improvement District No. One, all as authorized by statutes passed under § 52, Art. 3, Constitution of Texas, which permits creation of political divisions of the State, with power to sue and be sued, issue bonds, levy and collect taxes. An amendment to the Constitution—§ 59a, Art. 16—(October 2, 1917) declares the conservation and development of all the natural resources of the State, including reclamation of lands and their preservation, are "public rights and duties." Most of the bonds now in question were issued during 1914; the remainder in 1919.

By Act approved April 27, 1935, the Texas Legislature declared that municipalities, political subdivisions, taxing districts, &c., might proceed under the Act of Congress approved May 24, 1934.

It is plain enough that respondent is a political subdivision of the State, created for the local exercise of

her sovereign powers, and that the right to borrow money is essential to its operations. *Houck* v. *Little River Drainage District*, 239 U. S. 254, 261–262; *Perry* v. *United States*, 294 U. S. 330. Its fiscal affairs are those of the State, not subject to control or interference by the National Government, unless the right so to do is definitely accorded by the Federal Constitution.

The pertinent doctrine, now firmly established, was stated through Mr. Chief Justice Chase in *Texas* v. *White*, 7 Wall. 700, 725.—

"We have already had occasion to remark at this term, that 'the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence,' and that 'without the States in union, there could be no such political body as the United States.' Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

*Collector* v. *Day*, 11 Wall. 113, 125, 126—

"Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which is so indispensable, that, without them, the general government itself would disappear from the family of nations, it would seem to follow, as a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Con-

stitution, should be left free and unimpaired; should not be liable to be crippled, much less defeated by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence."

In *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 575, *et seq.,* relevant cases are collected and the following conclusion announced—

"This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system."

Notwithstanding the broad grant of power "to lay and collect taxes," opinions here plainly show that Congress could not levy any tax on the bonds issued by the respondent or upon income derived therefrom. So to do would be an unwarranted interference with fiscal matters of the State—essentials to her existence. Many opinions explain and support this view. In *United States* v. *Railroad Co.,* 17 Wall. 322, 329, this court said—

"A municipal corporation like the city of Baltimore is a representative not only of the State, but is a portion of its governmental power. It is one of its creatures, made for a specific purpose, to exercise within a limited sphere the powers of the State. The State may withdraw these local powers of government at pleasure and may, through its legislature or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence. As

a portion of the State in the exercise of a limited portion of the powers of the State, its revenues, like those of the State, are not subject to taxation."

See also *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 586; 158 U. S. 601, 630.

The power "To establish . . . uniform Laws on the subject of Bankruptcies" can have no higher rank or importance in our scheme of government than the power "to lay and collect taxes." Both are granted by the same section of the Constitution, and we find no reason for saying that one is impliedly limited by the necessity of preserving independence of the States, while the other is not. Accordingly, as application of the statutory provisions now, before us might materially restrict respondent's control over its fiscal affairs, the trial court rightly declared them invalid.

If federal bankruptcy laws can be extended to respondent, why not to the State? If voluntary proceedings may be permitted, so may involuntary ones, subject of course to any inhibition of the Eleventh Amendment. *In re Quarles*, 158 U. S. 532, 535. If the State were proceeding under a statute like the present one, with terms broad enough to include her, apparently the problem would not be materially different. Our special concern is with the existence of the power claimed—not merely the immediate outcome of what has already been attempted. And it is of the first importance that due attention be given to the results which might be brought about by the exercise of such a power in the future.

The especial purpose of all bankruptcy legislation is to interfere with the relations between the parties concerned—to change, modify or impair the obligation of their contracts. The statute before us expresses this design in plain terms. It undertakes to extend the supposed power of the Federal Government incident to bankruptcy over any embarrassed district which may ap-

ply to the court. See *Perry* v. *United States,* 294 U. S. 330, 353.

If obligations of States or their political subdivisions may be subjected to the interference here attempted, they are no longer free to manage their own affairs; the will of Congress prevails over them; although inhibited, the right to tax might be less sinister. And really the sovereignty of the State, so often declared necessary to the federal system, does not exist. *McCulloch* v. *Maryland,* 4 Wheat. 316, 430. *Farmers & Mechanics Bank* v. *Minnesota,* 232 U. S. 516, 526.

The Constitution was careful to provide that "No State shall pass any Law impairing the Obligation of Contracts." This she may not do under the form of a bankruptcy act or otherwise. *Sturges* v. *Crowninshield,* 4 Wheat. 122, 191. Nor do we think she can accomplish the same end by granting any permission necessary to enable Congress so to do.

Neither consent nor submission by the States can enlarge the powers of Congress; none can exist except those which are granted. *United States* v. *Butler,* decided January 6, 1936, 297 U. S. 1. The sovereignty of the State essential to its proper functioning under the Federal Constitution cannot be surrendered; it cannot be taken away by any form of legislation. See *United States* v. *Constantine,* 296 U. S. 287.

Like any sovereignty, a State may voluntarily consent to be sued; may permit actions against her political subdivisions to enforce their obligations. Such proceedings against these subdivisions have often been entertained in federal courts. But nothing in this tends to support the view that the Federal Government, acting under the bankruptcy clause, may impose its will and impair state powers—pass laws inconsistent with the idea of sovereignty.

The power to regulate commerce is necessarily exclusive in certain fields and, to be successful, must prevail

over obstructive regulations by the State. But, as pointed out in *Houston, E. & W. T. Ry.* v. *United States,* 234 U. S. 342, 353, "This is not to say that Congress possesses the authority to regulate the internal commerce of a state, as such, but that it does possess the power to foster and protect interstate commerce." No similar situation is before us.

The difficulties arising out of our dual form of government, and the opportunities for differing opinions concerning the relative rights of State and National Governments are many; but for a very long time this court has steadfastly adhered to the doctrine that the taxing power of Congress does not extend to the States or their political subdivisions. The same basic reasoning which leads to that conclusion, we think, requires like limitation upon the power which springs from the bankruptcy clause. *United States* v. *Butler, supra.*

The challenge to the validity of the statute must be sustained. The judgment of the Circuit Court of Appeals is reversed. The cause will be returned to the District Court for further action, consistent with this opinion.

*Reversed.*

Mr. Justice Cardozo, dissenting.

The question is a narrow one: Is there power in the Congress under the Constitution of the United States to permit local governmental units generally, and irrigation or water improvement districts in particular, to become voluntary bankrupts with the consent of their respective states?

Cameron County Water Improvement District Number One is a public corporation created by the laws of Texas. It has issued bonds for the construction of a canal system, which bonds are outstanding in the amount of $802,000. Default has been suffered to the extent of $147,000, either

for principal or for interest, upon its obligations now matured. But its own indebtedness is only a part of the financial burden that oppresses it. The bonded debt of other municipalities is a superior lien upon the property in the District for $10,386,000, and accumulated interest. The population is mainly agricultural. The farmers have been unable by reason of the great depression to make a living from their farms, and unable to pay their taxes in appreciable amounts. The District has made diligent effort to enforce collections, but without success. When it has attempted to foreclose its liens, it has been compelled for lack of bidders to buy the lands in and pay the court costs. After buying the lands in, it has been unable to get rid of them, for they have been subject to other tax liens prior to its own. The defaults are steadily mounting. For the year 1932, they were 63%; for the year 1933, 88.9%. The average market value of lands in the District does not exceed $75 per acre; and the total bonded debt per acre, principal and interest, is approximately $100. In these circumstances little good can come of levying more taxes to pyramid the existing structure. The remedies of bondholders are nominal, not real.

What is true of Cameron County Water Improvement District Number One is true in essentials of thousands of other public corporations in widely scattered areas. The hearings by committees of the Congress before the passage of the statute exhibit in vivid fashion the breadth and depth of the mischief which the statute was designed to remedy.[1] In January, 1934, 2019 municipalities, counties and other governmental units were known to be in default.[2] On the list, which was incomplete, were large

[1] See Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. 1868 and H. R. 5950, 1934, 73rd Cong., 2nd Sess.; Hearings before the House Committee on the Judiciary on H. R. 1670, etc., 1933, 73rd Cong., 1st Sess.

[2] See Senate Committee Hearings, *supra*, at p. 12.

cities as well as tiny districts. Many regions were included: 41 out of 48 states. Students of government have estimated that on January 1, 1933, out of securities to the extent of $14,000,000,000 issued by units smaller than the states, a billion were in default.[3] The plight of the debtors was bad enough; that of the creditors was even worse. It is possible that in some instances the bonds did not charge the municipalities or other units with personal liability. Even when they did, however, execution could not issue against the property of the debtor held for public uses,[4] and few of the debtors were the owners of anything else. In such circumstances the only remedy was a mandamus whereby the debtor was commanded to tax and tax again. *Rees* v. *Watertown,* 19 Wall. 107; *Meriwether* v. *Garrett,* 102 U. S. 472, 501.[5] The command was mere futility when tax values were exhausted. Often the holders of the bonds to the extent of ninety per cent or more were ready to scale down the obligations and put the debtor on its feet. A recalcitrant minority had capacity to block the plan. Nor was there hope for relief from statutes to be enacted by the states. The Constitution prohibits the states from passing any law that will impair the obligation of existing contracts, and a state insolvency act is of no avail as to obligations of the debtor incurred before its passage. *Sturges* v. *Crowninshield,* 4 Wheat. 122. Relief must come from Congress if it is to come from any one.

The next step in the inquiry has to do with the power of the Congress to eradicate the mischief. Is the Act in question, adopted May 24, 1934, to continue for two years (§§ 78, 79 and 80 of the Bankruptcy Act of 1898, as amended by 48 Stat. 798; 11 U. S. C. §§ 301, 302, 303),

---

[3] See the statistics gathered in 46 Harvard Law Review 1317.

[4] For a collection of the cases, see 3 McQuillin, Municipal Corporations, 2nd ed., § 1262.

[5] The cases are collected in 33 Columbia Law Review 28, 44.

and now extended to January 1, 1940 (April 10, 1936, c. 186, 49 Stat. 1198), a law "on the subject of Bankruptcies" within Article I, Section VIII, Clause 4 of the Constitution of the United States? Recent opinions of this court have traced the origin and growth of the bankruptcy power. *Continental Illinois National Bank* v. *Chicago, R. I. & P. Ry. Co.,* 294 U. S. 648, 668; *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, 588. The history is one of an expanding concept. It is, however, an expanding concept that has had to fight its way. *Hanover National Bank* v. *Moyses,* 186 U. S. 181, 184; Charles Warren, Bankruptcy in United States History (1935), p. 9. Almost every change has been hotly denounced in its beginnings as a usurpation of power. Only time or judicial decision has had capacity to silence opposition. At the adoption of the Constitution the English and Colonial bankruptcy laws were limited to traders and to involuntary proceedings. An Act of Congress passed in 1800 added bankers, brokers, factors and underwriters. Doubt was expressed as to the validity of the extension (*Adams* v. *Storey,* 1 Paine 79, 82), which established itself, however, with the passing of the years. *Hanover National Bank* v. *Moyses, supra.* Other classes were brought in later, through the bankruptcy Act of 1841 and its successors, "until now practically all classes of persons and corporations are included." *Continental Illinois National Bank* v. *Chicago, R. I. & P. Ry. Co., supra,* at p. 670. For nearly a century, voluntary proceedings have been permitted at the instance of the debtor as well as involuntary proceedings on the petition of creditors. The amendment, however, was resisted. The debates in Congress bear witness to the intensity of the feeling aroused by its proposal. Warren, *op. cit. supra,* at p. 72 *et seq.* For more than sixty years, the debtor has been able to compel a minority of his creditors to accept a composition if the terms have been approved by a designated majority as well as by the judge.

This change like the others had to meet a storm of criticism in Congress and the courts. Warren, *op. cit. supra,* at pp. 44, 45, 118–120; *In re Klein,* reported in a note to *Nelson* v. *Carland,* 1 How. 265, 277; *Louisville Joint Stock Land Bank* v. *Radford, supra.* Since the enactment of § 77 in March, 1933 (47 Stat. 1474; 11 U. S. C. § 205), a court of bankruptcy has been empowered to reorganize railroad corporations unable to pay their debts as they mature (*Continental Illinois National Bank* v. *Chicago, R. I. & P. Ry. Co., supra*), and since the enactment of § 77 B in June, 1934 (48 Stat. 912; 11 U. S. C. § 207), a like jurisdiction has existed in respect of business corporations generally. The Act for the relief of local governmental units is a stage in an evolutionary process which is likely to be misconceived unless regarded as a whole.[6]

Throughout that evolutionary process, the court has hewn a straight path.[7] Disclaiming a willingness to bind

---

[6] Warren, Bankruptcy in United States History (1935), p. 9: "The trail [of the bankruptcy clause] is strewn with a host of unsuccessful objections based on constitutional grounds against the enactment of various provisions, all of which are now regarded as perfectly orthodox features of a bankruptcy law. Thus, it was at first contended that, constitutionally, such a law must be confined to the lines of the English statute; next, that it could not discharge prior contracts; next, that a purely voluntary law would be non-uniform and therefore unconstitutional; next, that any voluntary bankruptcy was unconstitutional; next, that there could be no discharge of debts of any class except traders; next, that a bankruptcy law could not apply to corporations; next, that allowance of State exemptions of property would make a bankruptcy law non-uniform; next, that any composition was unconstitutional; next, that there could be no composition without an adjudication in bankruptcy; next, that there could be no sale of mortgaged property free from the mortgage. All these objections, so hotly and frequently asserted from period to period, were overcome either by public opinion or by the Court."

[7] The Emergency Farm Mortgage Act of 1933 was condemned in *Louisville Joint Stock Land Bank* v. *Radford, supra,* because destructive of rights of property protected by the Fifth Amendment.

itself by a cramping definition, it has been able none the less to indicate with clearness the main lines of its approach. In substance, it agrees with Cowen, J., who wrote: "I read the constitution thus: 'Congress shall have power to establish uniform laws on the subject of any person's general inability to pay his debts throughout the United States'" (*Kunzler* v. *Kohaus*, 5 Hill 317, 321), and with Blatchford, J., writing in the *Matter of Reiman*, Fed. Cas. No. 11,673, p. 496, that the subject of bankruptcy cannot properly be defined as "anything less than the subject of the relations between an insolvent or non-paying . . . debtor, and his creditors, extending to his and their relief." See *Hanover National Bank* v. *Moyses supra; Continental Illinois National Bank* v. *Chicago, R. I. & P. Ry. Co., supra; Louisville Joint Stock Land Bank* v. *Radford, supra.* Such was Story's view also. "A law on the subject of bankruptcies in the sense of the Constitution is a law making provision for persons failing to pay their debts." Story, Commentaries on the Constitution, § 1113, n. 3; cf. Warren, *op. cit. supra,* at p. 68. It is not necessary that the debtor have any property to surrender. One may resort to a court of bankruptcy though one has used up all one's property or though what is left is exempt. *Vulcan Sheet Metal Co.* v. *North Platte Valley Irrigation Co.,* 220 Fed. 106, 108; *In re Hirsch,* 97 Fed. 571, 573; *In re J. M. Ceballos & Co.,* 161 Fed. 445, 450. It is enough that in an omnibus proceeding between a nonpaying debtor on the one side and the creditors on the other, the debtor-creditor relation is to be readjusted or extinguished. Cf. Warren, *op. cit. supra,* at pp. 8, 144.

Cameron Water Improvement District Number One has no assets to surrender. If it shall turn out hereafter that there are any not exempt, the creditors may have them. Cameron Water Improvement District Number One is a debtor in an amount beyond its capacity for

payment, and has creditors, the holders of its bonds, who are persuaded that a reduction of the debt will redound to their advantage. Thirty per cent of the creditors had signified their approval of a proposed plan of composition before the filing of the petition, and 66⅔ per cent must give approval before the judge can act.[8] Even then the plan will count for nothing unless the judge upon inquiry shall hold it fair and good. A situation such as this would call very clearly for the exercise by a court of bankruptcy of its distinctive jurisdiction if the debtor were a natural person or a private corporation. Is there anything in the position of a governmental unit that exacts a different conclusion?

The question is not here whether the statute would be valid if it made provision for involuntary bankruptcy, dispensing with the consent of the state and with that of the bankrupt subdivision. For present purposes one may assume that there would be in such conditions a dislocation of that balance between the powers of the states and the powers of the central government which is essential to our federal system. Cf. *Hopkins Federal Savings & Loan Ass'n.* v. *Cleary,* 296 U. S. 315; *United States* v. *California,* 297 U. S. 175. To read into the bankruptcy clause an exception or proviso to the effect that there shall be no disturbance of the federal framework by any bankruptcy proceeding is to do no more than has been done already with reference to the power of taxation by decisions known of all men. *McCulloch* v. *Maryland,* 4 Wheat. 316. The statute now in question does not dislocate the balance. It has been framed with sedulous regard to the structure of the federal system. The governmental units of the state may not act under this statute except through the medium of a voluntary

---

[8] For taxing districts other than drainage, irrigation, reclamation and levee districts, the requisite percentages are 51% and 75% respectively.

petition which will evince their own consent, their own submission to the judicial power. Even that, however, is not enough. By subdivision (k), which is quoted in the margin,[9] the petition must be accompanied by the written approval of the state, whenever such consent is necessary by virtue of the local law. There is still another safeguard. By subdivision (e) (6), the composition, though approved by the requisite majority, shall not be confirmed by the judge unless he is satisfied that "the taxing district is authorized by law, upon confirmation of the plan, to take all action necessary to carry out the plan." To cap the protective structure, Texas has a statute whereby all municipalities, political subdivisions and taxing districts in the state are empowered to proceed under the challenged Act of Congress, and to do anything appropriate to take advantage of its provisions. This statute became a law on April 27, 1935 (Texas, Laws 1935, c. 107), after the dismissal of the proceeding in the District Court, but before the reversal of that decision by the Court of Appeals. Being law at that time it was to be considered and applied. *United States* v. *The Peggy*, 1 Cranch 103, 110; *Danforth* v. *Groton Water*

---

[9] "(k) Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any political subdivision thereof in the exercise of its political or governmental powers, including expenditures therefor, and including the power to require the approval by any governmental agency of the State of the filing of any petition hereunder and of any plan of readjustment, and whenever there shall exist or shall hereafter be created under the law of any State any agency of such State authorized to exercise supervision or control over the fiscal affairs of all or any political subdivisions thereof, and whenever such agency has assumed such supervision or control over any political subdivision, then no petition of such political subdivision may be received hereunder unless accompanied by the written approval of such agency, and no plan of readjustment shall be put into temporary effect or finally confirmed without the written approval of such agency of such plans."

*Co.,* 178 Mass. 472, 475, 476; 59 N. E. 1033; *Robinson* v. *Robins Dry Dock & Repair Co.,* 238 N. Y. 271, 281; 144 N. E. 579. There are like statutes in other states. Arizona, Laws 1935, c. 17; California, Laws (Extra Session) 1934, c. 4; Florida, Laws 1933, c. 15878; Ohio, Laws (2nd Special Session) 1934, No. 77. In Texas, at all events, it is clear to the point of demonstration, that the filing of a voluntary petition by a political subdivision does not violate the local law or any local public policy. Petitioners are not the champions of any rights except their own. *Premier-Pabst Sales Co.* v. *Grosscup, ante,* p. 226; *Hatch* v. *Reardon,* 204 U. S. 152, 160, 161.

To overcome an Act of Congress invalidity must be proved beyond a reasonable doubt. *Ogden* v. *Saunders,* 12 Wheat. 213, 270; *Sinking-Fund Cases,* 99 U. S. 700, 718. Sufficient reasons do not appear for excluding political subdivisions from the bankruptcy jurisdiction if the jurisdiction is so exerted as to maintain the equilibrium between state and national power. Persuasive analogies tell us that consent will preserve a balance threatened with derangement. A state may not tax the instrumentalities of the central government. It may do so, however, if the central government consents. *Baltimore National Bank* v. *State Tax Commission,* 297 U. S. 209. Reciprocally, the central government, consent being given, may lay a tax upon the states. Cf. *United States* v. *California, supra.* So also, interference by a state with interstate or foreign commerce may be lawful or unlawful as consent is granted or withheld. *In re Rahrer,* 140 U. S. 545; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311; *Whitfield* v. *Ohio,* 297 U. S. 431. The prevailing opinion tells us in summing up its conclusions that the bankruptcy power and the taxing power are subject to like limitations when the interests of a state are affected by their action. Let that test be applied, and the Act must be upheld, for jurisdiction is withdrawn if the state does not approve.

Reasons of practical convenience conspire to the same conclusion. If voluntary bankruptcies are anathema for governmental units, municipalities and creditors have been caught in a vise from which it is impossible to let them out. Experience makes it certain that generally there will be at least a small minority of creditors who will resist a composition, however fair and reasonable, if the law does not subject them to a pressure to obey the general will. This is the impasse from which the statute gives relief. "The controlling purpose of the bill is to provide a forum where distressed cities, counties and minor political subdivisions, designated in the bill as 'taxing districts,' of their own volition, free from all coercion, may meet with their creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed mutually advantageous. If a plan is agreed upon by the taxing district and its creditors holding two-thirds [in some instances three-fourths] in amount of the claims of each class of indebtedness, and if the court is satisfied that the plan is workable and equitable, it may confirm the plan, and the minority creditors are bound thereby." Report No. 207, House Judiciary Committee, June 7, 1933. To hold that this purpose must be thwarted by the courts because of a supposed affront to the dignity of a state, though the state disclaims the affront and is doing all it can to keep the law alive, is to make dignity a doubtful blessing. Not by arguments so divorced from the realities of life has the bankruptcy power been brought to the present state of its development during the century and a half of our national existence.

The Act does not authorize the states to impair through their own laws the obligation of existing contracts. Any interference by the states is remote and indirect. Cf. *In re Imperial Irrigation District,* 10 F. Supp. 832, 841. At most what they do is to waive a personal privilege that

they would be at liberty to claim. Cf. *Gunter* v. *Atlantic Coast Line R. Co.*, 200 U. S. 273, 284. If contracts are impaired, the tie is cut or loosened through the action of the court of bankruptcy approving a plan of composition under the authority of federal law. There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard. Cf. *Howard Fire Insurance Co.* v. *Norwich & New York Transportation Co.*, 12 Wall. 194, 199; *Southern Pacific Co.* v. *Darnell-Taenzer Co.*, 245 U. S. 531, 533. Impairment by the central government through laws concerning bankruptcies is not forbidden by the Constitution. Impairment is not forbidden unless effected by the states themselves. No change in obligation results from the filing of a petition by one seeking a discharge, whether a public or a private corporation invokes the jurisdiction. The court, not the petitioner, is the efficient cause of the release.

The Act is not lacking in uniformity because applicable only to such public corporations as have the requisite capacity under the law of the place of their creation. *Hanover National Bank* v. *Moyses, supra,* at p. 190. *Stellwagen* v. *Clum*, 245 U. S. 605, 613. Capacity existing, the rule is uniform for all. *Ibid.*

No question is before us now, and no opinion is intimated, as to the power of Congress to enlarge the privilege of bankruptcy by extending it to the states as well as to the local units. Even if the power exists, there has been no attempt to exercise it. There is room at least for argument that within the meaning of the Constitution the bankruptcy concept does not embrace the states themselves. In the public law of the United States a state is a sovereign or at least a quasi-sovereign. Not so, a local governmental unit, though the state may have invested it with governmental power. Such a governmental unit may be brought into court against its will

without violating the Eleventh Amendment. *Lincoln County* v. *Luning,* 133 U. S. 529; *Hopkins* v. *Clemson College,* 221 U. S. 636, 645. It may be subjected to mandamus or to equitable remedies. See, e. g., *Norris* v. *Montezuma. Valley Irrigation District,* 248 Fed. 369, 372; *Tyler County* v. *Town,* 23 F. (2d) 371, 373. "Neither public corporations nor political subdivisions are clothed with that immunity from suit which belongs to the State alone by virtue of its sovereignty." *Hopkins* v. *Clemson College, supra.*

No question as to the merits of any plan of composition is before us at this time. *Abrams* v. *Van Schaick,* 293 U. S. 188. Attention, however, may be directed to the fact that by the terms of the statute, subdivision c (11), the judge "shall not, by any order or decree, in the proceeding or otherwise, interfere with '(a) any of the political or governmental powers of the taxing district, or (b) any of the property or revenues of the taxing district necessary in the opinion of the judge for essential governmental purposes; or (c) any income-producing property, unless the plan of readjustment so provides," and that "the taxing district shall be heard on all questions." These restrictions upon remedies do not take from the statute its quality as one affecting the "subject of Bankruptcies," which, as already pointed out, includes a readjustment of the terms of the debtor-creditor relation, though there are no assets to be distributed. On the other hand, the restrictions are important as indicating the care with which the governmental powers of the state and its subdivisions are maintained inviolate.

The statute is constitutional, and the decree should be affirmed.

The CHIEF JUSTICE, MR. JUSTICE BRANDEIS and MR. JUSTICE STONE join in this opinion.