**In re PLEASANT VIEW UTILITY DISTRICT OF CHEATHAM COUNTY, TENNESSEE, Debtor.**

**Bankruptcy No. 382–01139.**

United States Bankruptcy Court, M.D. Tennessee.

Sept. 14, 1982.

---

Maclin P. Davis, Jr., and G. Scott Rayson, Waller Lansden Dortch & Davis, Nashville, Tenn., for Paul Mountcastle.

Cecil D. Branstetter, and Carrol D. Kilgore, Branstetter, Kilgore & Stranch, Nashville, Tenn., for Pleasant View Utility Dist. of Cheatham County, Tenn.

## MEMORANDUM

GEORGE C. PAINE, II, Bankruptcy Judge.

This matter is before the court pursuant to 11 U.S.C. § 921(c) on the objection of Paul Mountcastle, a creditor of the debtor Pleasant View Utility District, to the filing of the debtor's Chapter 9 bankruptcy petition.[1] Upon consideration of the evidence presented at the hearing on July 6, 1982, stipulations, exhibits, briefs of the parties and the entire record, this court concludes that the debtor is qualified to file a Chapter 9 petition under 11 U.S.C. § 109(c).

The following shall constitute findings of fact and conclusions of law pursuant to Rule 752 of the Federal Rules of Bankruptcy Procedure.

On September 28, 1962, Pleasant View Utility District was created by order of the County Court of Cheatham County, Tennes-

---

1. 11 U.S.C. § 921(c) provides:

"(c) After an objection to the petition, the court, after notice and a hearing, may dismiss the petition, if the debtor did not file the petition in good faith, or if the petition does not meet the requirements of this title."

see. By a resolution dated September 9, 1965, the debtor's Board of Commissioners authorized the issuance of revenue bonds in the amount of $3,500,000.00 and provided for the immediate issuance of Waterworks Revenue Bonds, Series 1965, with an aggregate value of $2,200,000.00. Pleasant View Utility District has thereafter been engaged in the business of providing water services to the customers in its designated region.

By December of 1981, Pleasant View Utility District was encountering serious financial problems. The District owed approximately $469,175.00 on matured interest, supplemental coupons and matured bonds; and, its yearly net income was only $405,770.41 for the fiscal year ending November 30, 1981. The District's financial statement dated November 30, 1981, concluded that the District lacked sufficient cash to meet its long term debt obligations. The statement further reflected that the District had a net loss of $11,195.04 for the fiscal year ending November 30, 1981.

Due to its financial plight, the District entered into various negotiations in an attempt to obtain additional funding from either bondholders or other entities. None of these efforts proved successful. The District was ultimately denied a loan application by the Farmers Home Administration on March 25, 1982. The District also presented several separate proposals to Paul Mountcastle and his sister Marguerite Stanley, who together own more than 50% of the outstanding bonds of the District, by which these bondholders would invest additional money in the District in return for the issuance of new bonds. These proposals were summarily rejected by Mr. Mountcastle on March 24, 1982, and Mr. Mountcastle advised the District that he intended to "file a class action in the Chancery Court at Ashland City in behalf of all the bondholders to enforce their rights under the bonds." Mr. Mountcastle's intention to file this suit was reaffirmed in letters to the District attorney's dated April 5 and April 8, 1982. The District then filed this Chapter 9 petition on April 12, 1982.

At the hearing of this matter, the debtor introduced a six month audit report ending on May 31, 1982, which reflected the District's continuing financial decline. The report showed that the District suffered a net loss of $33,465.58 during this six month period; that the District owed $318,033.75 in matured, unpaid interest coupons alone as of May 31, 1982; and, that an additional $56,687.50 in interest coupons would mature on June 1, 1982. The report stressed that the District did not possess sufficient cash to redeem these interest coupons or to pay the bonds which had matured prior to May 31, 1982.

Pleasant View Utility District contends that these circumstances, coupled with applicable Tennessee law defining the powers granted to local utility districts, permit the District to file a Chapter 9 bankruptcy petition pursuant to 11 U.S.C. § 109(c). Section 109(c) provides as follows:

"(c) An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is generally authorized to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent or unable to meet such entity's debts as such debts mature;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a preference."

11 U.S.C.A. § 109(c) (West 1979).

■ The parties do not seriously dispute that the District is a municipality as defined by the Bankruptcy Code. 11 U.S.C.A. § 101(29) (West 1979) defines municipality as a "political subdivision or public agency or instrumentality of a State." This definition clearly encompasses a utility district such as the debtor, which § 7–82–301 of the Tennessee Code classifies as a municipality or public corporation. *See First Suburban Water Utility District v. McCanless,* 177 Tenn. 128, 146 S.W.2d 948, 950 (1941).

The central issue, and the issue which is the focus of the creditor's objection, is whether the law of Tennessee generally authorizes the District to be a debtor under Chapter 9 of the Bankruptcy Code. The District relies on § 7–82–306 of the Tennessee Code as granting a utility district the authority to file a petition for relief under Chapter 9. Tenn.Code Ann. § 7–82–306 (1980) provides as follows:

> *"General implementing powers.—Any district* created pursuant to the provisions of this chapter *shall be vested with all the powers* necessary and requisite of the accomplishment for the purpose for which such district is created, *capable of being delegated by the legislature.* No enumeration of particular powers herein created

shall be construed to impair or limit any general grant of power herein contained nor to limit any such grant to a power or powers of the same class or classes as those enumerated. *The district is empowered to do all acts necessary, proper or convenient in the exercise of the powers granted herein."* (emphasis added).

The creditor. Mountcastle denies that this language is sufficient to support a finding that the State of Tennessee has generally authorized a utility district to file a Chapter 9 petition. Mountcastle contends that these provisions, which were enacted in 1937 as part of The Utility District Act of 1937, could not authorize a utility district to be a debtor in a federal bankruptcy court since, at the time of enactment, a municipality could not file a federal bankruptcy petition under any circumstances.[2] To buttress this argument, Mountcastle cites § 7–82–107 of the Tennessee Code which states that the "provisions of any other law, general, special or local, except as provided in this chapter, shall not apply to a district incorporated hereunder." Tenn.Code Ann. § 7–82–107 (1980). Mountcastle asserts that this language prohibits a utility district from seeking relief under the federal bankruptcy laws.

The resolution of this dispute is ultimately dependent upon establishing the parameters of the phraseology "generally authorized to be a debtor under such Chapter by State law."[3] The legislative history of 11

---

2. Congress enacted the first municipal bankruptcy legislation in 1934. In 1936, however, the Supreme Court of the United States found the legislation unconstitutional as a violation of the tenth amendment to the United States Constitution. *Ashton v. Cameron County Water Improvement District No. One,* 298 U.S. 513, 530–532, 56 S.Ct. 892, 895–96, 80 L.Ed. 1309 (1936). In response to *Ashton,* Congress reformulated and passed the second municipal bankruptcy act on August 16, 1937. The Supreme Court subsequently upheld the constitutionality of this legislation in *United States v. Bekins,* 304 U.S. 27, 51, 58 S.Ct. 811, 815, 82 L.Ed. 1137 (1938). The court's opinion in *Bekins* effectively overruled the *Ashton* decision. *Prudential Insurance Co. v. Benjamin,* 328 U.S. 408, 433 n. 42, 66 S.Ct. 1142, 1157 n. 42, 90 L.Ed. 1342 (1945).

3. This court has discovered a paucity of case law interpreting the meaning of the language "generally authorized." In the only case found by this court addressing the issue, the Bankruptcy Court for the Western District of Pennsylvania held that a joint municipal authority, which had been created under Pennsylvania law to construct and operate sewer systems, had been generally authorized by the State of Pennsylvania to file a petition under Chapter 9 of the Bankruptcy Code. *In the Matter of North and South Shenango Joint Municipal Authority,* 14 B.R. 414, 416–421 (Bkrtcy.W.D.Pa. 1981), *petition for mandamus or prohibition denied sub nom. Pennbank v. Washabaugh,* 8 B.C.D. 509, 673 F.2d 1301 (3rd Cir.1981). The court's finding basically relied on the distinction in Pennsylvania law between municipal authorities such as the debtor, which were authorized to do all acts necessary or convenient

U.S.C. § 109(c) indicates that the "generally authorized" provision was retained from the 1976 revision of Chapter IX of the former Bankruptcy Act. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 8, 110–111, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5794–5795, 5896–5897; 124 Cong.Rec. S17,-407 (daily ed. Oct. 6, 1978) (remarks of Sen. Deconcini); 124 Cong.Rec. H11,091 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). The final version of § 109(c) did not adopt the House's proposal that a municipality would be eligible to file a Chapter 9 petition unless such filing was prohibited by state law. *See* H.Rep. No. 595, 95th Cong., 1st Sess. 262–264, 318–319, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5963, 6220–6222, 6275–6277. *See also* H.R.Doc. No. 93–137, 93rd Cong., 1st Sess. 273–276 (1973). The Senate rejected this standard on the presumption that affirmative action by the state was necessary in order to avoid a serious constitutional question under the tenth amendment. S.Rep. No. 989, 95th Cong., 2d Sess. 110–111, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5896–5897. *See generally* Hefner, *New Power of the Chapter IX Bankruptcy Court to Authorize the Issuance of Certificates of Indebtedness: Congressional Relief or Congressional Overreaching?*, 51 Am.Bankr.L.J. 1 (1977); Note, *Municipal Bankruptcy, the Tenth Amendment and the New Federalism,* 89 Harv.L.Rev. 1871 (1976); Ellison, *The Recent Revision of the Federal Municipal Bankruptcy Statute: A Potential Reprieve for Insolvent Cities?,* 13 Harv.J. on Legis. 549, 567–570 (1976) (articles discussing the relationship between federal municipality bankruptcy legislation and the tenth amendment).

The Senate's rejection of the proposed House language should not, however, be construed to unnecessarily restrict a municipality from seeking relief in a Chapter 9

proceeding. A review of the history of § 109(c) indicates that the term "generally authorized" was intended to be given a broad interpretation. The requirement that a municipality must be generally authorized by state law to file a bankruptcy petition was first contained in the 1976 revision of Chapter IX of the former Bankruptcy Act. Although the prior 1937 version of Chapter IX did not include this specific requirement, § 83(e) [11 U.S.C.A. § 403 (West 1975) (repealed 1976)] did forbid a judge from confirming a Chapter IX plan if he found that the petitioner was not "authorized by law to take all action necessary to be taken by it to carry out the plan." In fact, the Supreme Court in *United States v. Bekins* equated the provisions of § 83(e) as in effect requiring state authorization for a municipality to proceed with a plan of composition under Chapter IX. As the Supreme Court explained:

"Our attention has been called to the difference between § 80(k) of Chapter IX. and § 83(i) of Chapter X. of the Bankruptcy Act in the omission from the latter of the provision requiring the approval of the petition by a governmental agency of the State whenever such approval is necessary by virtue of the local law. We attach no importance to this omission. It is immaterial, if the consent of the State is not required to make the federal plan effective, and it is equally immaterial if the consent of the State has been given, as we think it has in this case. It should also be observed that Chapter X. § 83(e) provides as a condition of confirmation of a plan of composition that it must appear that the petitioner 'is authorized by law to take all action necessary to be taken by it to carry out the plan,' and, if the judge is not satisfied on that point as well as on the others mentioned,

for the promotion of their business, and political subdivisions, which were required to obtain the approval of the State Department of Community Affairs before they could file a petition for relief under the federal bankruptcy law. The court concluded that the State's calculated decision to restrict political subdivisions' resort to federal bankruptcy law evidenced a contrary

intent in regard to municipal authorities. This proof was deemed sufficient to demonstrate that the State of Pennsylvania had "generally authorized" the debtor to file a petition for relief in the bankruptcy court. *In the Matter of North and South Shenango Joint Municipal Authority,* 14 B.R. at 417–421.

he must enter an order dismissing the proceeding. The phrase 'authorized by law' manifestly refers to the law of the State. [11 U.S.C.A. § 403.]"

*United States v. Bekins*, 304 U.S. at 49, 58 S.Ct. at 814. *See also Faitoute Iron & Steel Co. v. Asbury Park*, 316 U.S. 502, 508, 62 S.Ct. 1129, 1132, 86 L.Ed. 1629 (1942); 5 Collier on Bankruptcy ¶ 81.04, at 1563–1565 (14th ed. 1978); 10 Remington on Bankruptcy § 4294, at 524–526 (1947).

The courts have generally applied a flexible standard in determining whether a state had consented to a municipality reorganization under § 83(e). *See Buchholz v. South Beardstown Drainage & Levee District*, 125 F.2d 13, 14–15 (7th Cir.1941); *Roberts v. Board of Public Instruction*, 112 F.2d 459, 461–462 (5th Cir.1940); *Vallette v. City of Vero Beach*, 104 F.2d 59, 64 (5th Cir.1939), *cert. denied* 308 U.S. 586, 60 S.Ct. 110, 84 L.Ed. 491 (1939); 5 Collier on Bankruptcy ¶ 81.04, at 1564–1565 (14th ed. 1978); 10 Remington on Bankruptcy ¶ 4294, at 525–526 (1947). *See generally Mission Independent School District v. Texas*, 116 F.2d 175, 177 (5th Cir.1940), *cert. denied* 313 U.S. 562, 61 S.Ct. 839, 85 L.Ed. 1522 (1941) (court admitting that a difficult question would be posed if the state failed to expressly consent to the exertion of the federal bankruptcy power). At least one court interpreted the phrase "authorized by law" in § 83(e), which connotes a much stricter standard than the terminology "generally authorized" in § 109(c), to include a state statute such as the Tennessee statute in this case which gives a municipality the general power to control its financial affairs. As the court observed in *In re Drainage District No. 7*, 21 F.Supp. 798, 805 (E.D.Ark. 1937):

"The question was raised in argument as to whether or not the new act could apply constitutionally to an Arkansas district because it was urged that no legislation of Arkansas permitted a drainage district to avail itself of the act. In the most explicit terms, however, section 12 of Act 212 of 1937, p. 779, creating the State Flood Control Commission reserves to levee and drainage districts the right to proceed in pursuance of any insolvency statute or bankruptcy Act now or hereafter adopted by the Congress of the United States, or by the State of Arkansas,'

. . .

. . . Hence express legislative permission has been granted for this proceeding if any be required; *but I do not deem that permission is required in view of the general authority of the districts to control their financial affairs, to refund their bonds and to sue and be sued.*" (emphasis added).

Nor does the legislative history of either § 84 of the 1976 revision of former Chapter IX[4] or § 109(c) of the Bankruptcy Code,

---

4. Although not necessary to this decision, the court would note that Chapter 9 affords the municipal district in this case the only practical remedy for debt adjustment. Should the District not be allowed to proceed in Chapter 9 and continue to be unable to meet the payments on its matured bonds and interest, then the law of Tennessee would essentially allow the District's bondholders to foreclose on the District's property or petition for the appointment of a receiver to administer the District in accordance with the provisions of Chapter 82 of the Tennessee Code. Tenn.Code Ann. § 7-82-505 (1980). The practical advantages of proceeding under Chapter 9 rather than a state receivership were aptly outlined in *In the Matter of North and South Shenango Joint Municipal Authority*, 14 B.R. at 421:

"... the petition filed by the debtor for an adjustment of its debts under Chapter 9 of the Bankruptcy Act would provide more adequate relief to all of the parties involved in this difficult situation than the action of PennBank for the appointment of a Receiver under Section 6 of the Municipality Authorities Act, 53 P.S. Section 308 which is essentially an action of foreclosure by a secured creditor who would be disqualified by its conflict of interest from having a controlling voice or vote in a bankruptcy reorganization or debt readjustment proceeding... The builtin protections and advantages of bankruptcy reorganization procedures include a stay of proceedings against the debtor's revenues and assets by other creditors, the power of inquiry into and setting aside when appropriate of transfers of assets found to have been preferential, the conduct of required litigations ... in the single forum of the Bankruptcy Court and the transfer to such forum of all such pending actions under our nationwide jurisdiction over all litigations in any

which is virtually identical to § 84, indicate that Congress intended to narrow the broad interpretation previously applied by federal courts in determining whether a state had consented to a municipality's filing of a petition for relief in a federal bankruptcy court. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 8, 110, *reprinted in* 1978 U.S.Code Cong. and Ad.News 5787, 5794–5795, 5896–5897; H.R.Rep. No. 938, 94th Cong., 2d Sess. 16–17, *reprinted in* 1976 U.S.Code Cong. and Ad.News 583, 586; H.R.Doc. No. 137, 93rd Cong. 1st Sess. 274–275. Indeed, the language "generally authorized" by a state represents an expansion of the Act's prior requirement that a municipality must be "authorized by law" to proceed with a reorganization under Chapter IX. Even the Senate Report on the 1976 revision of former Chapter IX, which initially proposed that a municipality must be "specifically authorized" by the state to file a petition under Chapter IX, recognized that this requirement should be liberally construed. As the Report stated:

"Subsection 803(a) provides that any municipality or other entities named in this subsection are eligible for relief under this Chapter if the petitioner is first specifically authorized by the State to file a petition under this Chapter. The Committee considered it questionable whether the affirmative consent of the state is constitutionally required. If not for constitutional reasons, the Committee believed as a policy matter that such consent should be obtained. *A general statutory provision which may have been enacted prior to this Chapter is thought by the Committee to meet the requirement of specific consent. In the absence of general statutory consent,* 803(a) authorizes the chief executive, legislature or any other governmental officer or organizations, so empowered under state law, to authorize the filing of such a petition." (emphasis added).

S.Rep. No. 458, 94th Cong., 2d Sess. 16 (1975).

Finally, a strict construction of the term "generally authorized" would be in direct contravention with the Congressional concern that financially distressed municipalities should be able to efficiently and expeditiously reorganize their economic affairs. As the Senate Committee on the Judiciary observed in its Report on the 1976 revision of Chapter IX of the former Bankruptcy Act:

"While Chapter IX has no doubt performed a valuable function during the period of its existence, in recent years it has become clear that amendment is necessary *if it is to provide an adequate vehicle for reorganization of a troubled municipality. . .*

*The provisions of the chapter should provide ready access to the bankruptcy courts. It is during the first steps of reorganization that delay could cause the most permanent harm.*" (emphasis added).

S.Rep. No. 458, 94th Cong., 2nd Sess. 13 (1976). *See also* H.R.Rep. No. 595, 95th Cong. 1st Sess. 262–263 *reprinted in* 1978 U.S.Code Cong. and Ad.News 5963, 6220–6221; H.R.Rep. No. 686, 94th Cong.2d Sess. 3–4, *reprinted in* 1976 U.S.Code Cong. and Ad.News 539, 541–542.

▮ This court accordingly concludes that the term "generally authorized" as used in § 109(c) means only that the state should give some indication that the municipality has the necessary power to seek relief under the federal bankruptcy law. In this case, the State of Tennessee has provided the debtor with broad powers, including the ability to sue and be sued, to make and enter into contracts, and to incur debts. Tenn.Code Ann. § 7–82–304 (1980). The State has also vested the district with "all the powers necessary and requisite for the accomplishment of the purpose for which such district is created, capable of being

---

way related to a bankruptcy case, and in addition, *the working out of an equitable composition of the claims and rights of all classes of creditors which no state court proceeding or receivership has constitutional authority to effect. . . .*" (emphasis added.)

*See also* H.R.Rep. No. 517, 75th Cong. 1st Sess. 3–4 (1937), *quoted in* H.R.Rep. No. 686, 94th Cong.2d Sess. 4, *reprinted in* 1976 U.S.Code Cong. and Ad.News 539, 541–542.

delegated by the legislature." Tenn.Code Ann. § 7–82–306 (1980). This court finds these delegations sufficient to encompass the power to invoke the aid of the federal bankruptcy courts.[5]

The court further finds that the District has met the remaining requirements set forth in § 109(c). The District is clearly unable to meet its debts as they become due. As of December of 1981, the District owed approximately $469,175.00 on matured interest, supplemental coupons and matured bonds. The financial statements prepared for the District reflected that the District did not have sufficient cash available to pay these obligations. The statements further showed that the District had a net loss of $11,195.04 for the fiscal year ending November 31, 1981, and that this loss had increased to $33,465.38 for the six month period ending on May 31, 1982. By May 31, 1982, the District owed approximately $318,033.75 in matured, unpaid interest coupons alone. Under these circumstances, the debtor clearly has not been and cannot in the future meet its obligations as they become due. *See In re Drainage District No. 2,* 28 F.Supp. 84, 85 (D.Idaho 1939); *In re Corcoran Irrigation District,* 27 F.Supp. 322, 325 (S.D.Cal.1939).[6] Nor can there be any doubt that the debtor desires to effect a plan to adjust its debts since the debtor has already submitted such a plan for the court's approval.

Finally, the evidence demonstrates that the District has unsuccessfully negotiated in good faith with Mr. Mountcastle and his sister, who hold more than 50% of the outstanding bonds of the District, and that any further negotiation with these creditors would be impracticable. The District submitted several proposals to these creditors, all of which were rejected. Shortly before the filing of this petition, these creditors had expressed to the District their intention to file a class action on behalf of all the bondholders to enforce their rights under the bonds. Not until this time did the district decide to file a petition for relief in this court.

The court accordingly finds that the District has met the requirements outlined in 11 U.S.C. § 109(c) and therefore will enter an order denying the creditor Paul Mountcastle's objection to the debtor's filing of this Chapter 9 petition.

IT IS, THEREFORE, SO ORDERED.

---

**5.** The creditor urges that the debtor cannot avail itself of federal bankruptcy law under § 7–82–107 of the Tennessee Code, which provides that the "provisions of any other law, general, special or local, *except as provided in this chapter,* shall not apply to a district incorporated hereunder." (emphasis added). Tenn. Code Ann. § 7–82–107 (1980). This court has found, however, that the delegations of power granted to a utility district such as the debtor under Chapter 82 include the authority to seek relief under the federal bankruptcy law. Section 7–82–107 is thus inapplicable in this case.

**6.** The creditor intimates that the debtor could possibly receive more cash flow and thereby reduce its debt by increasing the rates charged to its customers. The creditor, however, has not demonstrated that such rates could be sufficiently increased to satisfy the District's entire outstanding debt or even a portion of that debt. Furthermore, the creditor has not shown that such an increase would be "reasonable" as required by § 7–82–403 of the Tennessee Code or that such a rate increase would not result in the loss of customers to the district. In any event, the mere contingency that the District could improve its financial situation by increasing its rates does not alter the fact that at the present time the District cannot meet its debts as they mature. *See In re Drainage District No. 2,* 28 F.Supp. at 85. The creditor also contends that the district has funds available which could be used to offset its debt. This allegation is in direct conflict with the financial reports prepared for the debtor and, from the proof presented, this court finds no reason to doubt the accuracy of these reports.