VALLETTE et al. v. CITY OF VERO BEACH, FLA.

No. 9057.

Circuit Court of Appeals, Fifth Circuit.

May 22, 1939.

Miller Walton and Frank O. Spain, both of Miami, Fla., Giles J. Patterson, of Jacksonville, Fla., and C. L. Chancey, of Fort Lauderdale, Fla., for appellants.

Robert J. Pleus, of Orlando, Fla., and Charles A. Mitchell, of Vero Beach, Fla., for appellee.

Before SIBLEY, HOLMES, and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

In the District Court under Chapter IX of the Bankruptcy Act as amended June 22, 1938, 11 U.S.C.A. § 403, an interlocutory decree was made confirming a plan for the composition of the debts of City of Vero Beach, Florida. Four creditors appeal, three of whom had before the filing of the petition on Aug. 2, 1938, obtained judgments on their securities and mandamus absolute for the levy of taxes to pay them, and the fourth held only interest coupons which matured prior to Jan. 1, 1935. They contended in the court below and here contend that creditors having judgments and mandamuses are in the position of secured creditors having a vested right in the taxes severally ordered to be levied, of which the Act does not and constitutionally could not deprive them, and that they should have been put in a separate class or classes and no plan confirmed which affected their claims without a two-thirds majority consent of such classes. The coupon-holding creditor contends the plan was not fair and equitable as to him because of its treatment of interest which accrued prior to Jan. 1, 1937. The appellants all attack the plan as unlawfully and excessively compensating R. E. Crummer & Co., called herein the Fiscal Agent, for expenses and services in the preparation and consummation of the plan. Other contentions will be stated in the discussion which follows.

It appears that the City of Vero Beach by the latest census has about three thousand population. Its indebtedness as stated in the plan totals $1,818,142. The assessed value of property is asserted in argument to be only a little over $2,000,000. The indebtedness was mainly incurred during the Florida boom which terminated in 1926. As of Jan. 1, 1937, defaults in interest amounted to $450,549, and in bond principal to $699,242. Tax levies sufficient to clear up the defaults would manifestly be very oppressive if at all capable of collection. Numerous proceedings in State and federal courts were pending to collect defaulted debts.

Brown-Crummer Company, bond dealers, had owned and sold many issues of bonds in Florida. When the collapse came R. E. Crummer & Company was organized separately, and devoted almost its whole time and attention to refunding Florida bond issues, having two offices in Florida and one in Chicago manned by about fifty employees. Their experience, efficiency, and success in refunding operations are established. On Dec. 8, 1936, the City of Vero Beach contracted with them to act as Fiscal Agent in refunding the City's obligations. The Agent formulated a plan whereby interest and taxes accruing prior to Jan. 1, 1937, should be dealt with together, and the principal should be covered by refunding bonds dated Jan. 1, 1937, bearing 2% interest at first, but increased to 5% after twenty years, maturity being postponed to 1972. A bearable tax rate for debts was figured, about half of which would serve to carry the interest and the remainder would go into a sinking fund to buy up and retire the refunded bonds. The plan was largely accepted, the new bonds were prepared, executed and validated, but appellants and some others would not agree. During this time, the first Municipal Bankruptcy Act having been held unconstitutional, bankruptcy relief was not in contemplation, but on April 25, 1938, the case of United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, was decided, upholding what is now Chapter IX of the Bankruptcy Act, and on June 22, 1938, the Chandler Act was approved which added to Section 83 the Subsection (j), 11 U.S.C.A. § 403(j), which expressly allows the perfection in bankruptcy of a plan of composition begun before. The plan made for the City of Vero Beach was thereupon presented to the Court. The holders of more than 70% of the securities accepted it forthwith; only six objected. The judge had hearings in November and December, 1938. He criticized the plan as permitting the Fiscal Agent to speculate in and perhaps realize too great a profit on the handling of interest coupons maturing prior to Jan. 1, 1937. The plan was then by the City modified to make such handling by the Fiscal Agent to be at the option of the coupon holders, and in some other respects. The hearing was then adjourned for a month and all creditors served with copy of the modified plan. When the hearing was resumed only one creditor,

having a $1,000 bond, expressed desire to withdraw his consent. The judge heard all the evidence that was offered, found the plan as modified to be fair and equitable and for the interest of all creditors and not unfairly discriminatory as to any of them, and otherwise lawful; he. overruled all objections and confirmed it.

■ 1. One objection is that the plan having been modified, consenting creditors ought to have been allowed express opportunity to withdraw their consent. The Act, Sect. 83, (e), 11 U.S.C.A. § 403(e), states that modifications may be made "with the approval of the judge after hearing upon such notice to creditors as the judge may direct, subject to the right of any creditor who shall previously have accepted the plan to withdraw his acceptance, within a period to be fixed by the judge and after such notice as the judge may direct, if, in the opinion of the judge, the change or modification will be materially adverse to the interest of such creditor," etc. We have held in a parallel situation touching a corporate reorganization that in the absence of a finding that the change did not materially and adversely affect the creditors, they ought to have notice and an opportunity to be heard. Continental Ins. Co. v. Louisiana Oil Ref. Co., 5 Cir., 89 F.2d 333. Here the judge did not decide whether the change of plan adversely affected any creditor, but "out of abundance of caution" ordered notice of the changes in plan to be given all creditors ten days before the date fixed for the further hearing, with a copy of the order, which order stated that the right of consenting creditors to withdraw their consents would be determined when any asked leave. As above stated, only a $1,000 claim asked leave, and withdrawal by it would not affect the result. We are of opinion that the Act was substantially complied with. Each creditor was advised of the changes, and that the court would entertain requests to withdraw consents if made, and of the date when the matter was to be further heard. No one is complaining but appellants, and they have all along been objectors, with full knowledge of all the proceedings. The court was in position to consider the modified plan at the date appointed.

■ 2. It is said the court did not hear evidence as to certain questions of fact raised by objections, especially whether taxes for the years 1936, 1937 and 1938

had been levied as contemplated by the plan. We think the objectors should have offered the evidence if they considered it important. They suggested the issue. The judge did not refuse to hear evidence; they omitted to offer it.

■ 3. A more earnestly argued contention is that bond and coupon holders who before the filing of the petition had obtained mandamuses absolute for the levy and collection of taxes had secured vested rights of which the Act did not, and in view of the Fifth Amendment could not, deprive them, at least unless separately classified with a two-thirds majority in amount consenting. The judge held that all the debts were "payable without preference out of funds derived from the same source, towit, ad valorem taxes, and no specific property or revenue is pledged to the payment of said bonds or any of them," that judgments and mandamuses made no difference, and there was but one class of creditors. The Act, Sect. 83(b), 11 U.S. C.A. § 403(b), declares that at the hearing or a continuance thereof, if the allegations of the petition are sustained, "the judge shall classify the creditors according to the nature of their respective claims and interests: Provided, however, That the holders of all claims, regardless of the manner in which they are evidenced, which are payable without preference out of funds derived from the same source or sources shall be of one class. The holders of claims for the payment of which specific property or revenues are pledged, or which are otherwise given preference as provided by law, shall accordingly constitute a separate class or classes of creditors." The basis of classification is thus seen to be (a) the source of normal payment, (b) security by pledge of specific property or revenue, (c) preference provided by law. The reference is to the status of the claims under the State law at the time the petition is filed. If there be security by a pledge of property, a separate class must be established for each security if the debt or security is to be affected by the plan. So also if a special source of revenue be pledged. The word "pledge" refers to a contractual arrangement, rather than to some advantage or lien obtained through legal proceedings. The case of the general creditor who has obtained judgment with a mandamus absolute is more plausibly referred to the words "given preference as provided by law." But a judgment

against a municipality in Florida has no lien. Previous decisions so stated: Little River Bank & Trust Co. v. Johnson, Mayor, 105 Fla. 212, 141 So. 141; City of Sanford v. Dofnos Corp., 115 Fla. 795, 156 So. 142; and the Legislature so declared, Chap. 17125, Acts of 1935. According to the decisions and the statute a mandamus to force the application of money on hand to the debt, or to compel the raising of it by taxation, is the ordinary process to compel payment. There is no statute giving any lien or preference because of the grant of a mandamus. On its face the mandamus is a mere court order to an officer to do his duty. But the court, as to money actually in the officer's hands which he is ordered to pay over, whether there at the time the mandamus issued or collected under it, has said there is a sort of lien or preference as against others similar to that arising on the levy of a fieri facias. See State ex rel. Lawler v. City of West Palm Beach, 125 Fla. 626, 170 So. 697, 174 So. 737; State ex rel. City & County Holding Co. v. Board of Public Instruction, 120 Fla. 599, 163 So. 8; City of Winter Haven v. State ex rel. Baynes, 114 Fla. 527, 154 So. 879. Whether under the Bankruptcy Act the creditor who by mandamus had thus segregated actual money for application to his debt could retain it, or at least demand separate classification, we need not determine. Here all such segregations had been paid over before the petition was filed and are not sought to be brought into account; there were outstanding only mandamuses to compel future collections of taxes. No law gives them any preference. They fix no vested right in any existing thing which the bankruptcy power could not touch, or which could not be arrested by injunction under Sect. 83(c), 11 U.S.C.A. § 403(c). The judge rightly held that all bonds and coupons were payable from the same source, towit, general property taxation, whether evidenced by judgment or otherwise, and were to be classed together under the Act.

■■ 4. But the two-thirds vote of this single class will not be sufficient to justify arbitrary and unfair treatment of the minority. No plan will be given confirmation unless the judge "is satisfied that * * * it is fair, equitable, and for the best interests of the creditors and does not discriminate unfairly in favor of any creditor or class of creditors." Sect. 83(e). We do not see anything unfair or inequi-

table in refusing to appellants who have secured mandamuses any future advantage of them. It is the general spirit of bankruptcy proceedings to ignore such advantages, partly in order to discourage a race to obtain them. Probably the costs adjudged constitute an additional debt which could be proved, but no point has been made of that small matter.

■■ 5. A more serious question of unfairness arises in the case of the appellant who has only coupons which matured before Jan. 1, 1937. He, in common with bondholders who also have such interest coupons, will be required at once to surrender and cancel 30% of his coupons and to deposit the remaining 70% in an "escrow" for a year or more, during which taxes for the years prior to 1936 will be collected or compromised by the City and paid over to the escrow agent, who will cancel coupons at the rate of two dollars for one. Coupons remaining at the close of the escrow will be refunded at par into bonds with interest from Jan. 1, 1939. These old coupons are debts as valid against the City as are any of the bonds, so far as we can see, and we are not informed why they were not refunded on the same basis. The entire record of the hearing has not been brought up. It may be that it was considered that the appropriation of the uncollected taxes for the years prior to 1936 to these coupons was an advantage which offsets the sacrifices. These coupons, as we shall see, are also surrenderable at holder's option to the Fiscal Agent at a fixed price, which may also be an advantage. If each bondholder has retained his old coupons, there would be no unfairness or discrimination, since all would be proportionately affected. Only one appellant appears to be without bonds and to have only old coupons, and he does not complain on this specific ground. We do not feel compelled to condemn the plan under these circumstances. The only discrimination which is urged in this connection is that some of the old coupons matured at different times in the six months preceding Jan. 1, 1937, and that no adjustment was provided therefor. Theoretically this is a just criticism, but the actual loss that might be caused is relatively slight, and in the general adjustment among such coupons the losses on one coupon might be offset by resulting gains in distributions to the others held by the same person. No clear case of a specific dis-

crimination is made by any appellant. The possibility of it we think may be ignored.

■■ 6. The plan states that "the City and Fiscal Agent have agreed to develop a reasonable course of procedure for the adjustment and collection of the reasonable maximum equity of delinquent taxes for the year 1935 and prior, and special assessment liens." Appellants deny that the City has any power to compromise tax claims. The plan seems to refer to the Special Act, Chapter 18960, Acts of 1937, which specifically authorizes this City "to adjust delinquent city taxes and improvement liens * * * when it appears, in the judgment of the City Council, that said delinquent taxes and liens, together with outstanding and unpaid state and county taxes, are out of proportion to the value of the property against which said taxes and liens are assessed." This Act is said to be void because an unconstitutional impairment of the obligation of the contract of antecedent bondholders. We are not here concerned with the contract rights that may exist as to improvement liens, since the plan covers only general tax bonds. Aside from bankruptcy, the compromise of taxes against overburdened property would impair no such bondholder's rights, for the City would remain bound to impose and collect sufficient general taxes to pay him. The Special Act is not invalid. It expresses the consent of the State that reasonable adjustments be made. In bankruptcy and in this particular plan the adjustments are at the expense of the couponholders in a sense, but the result is to leave a larger unpaid balance for final refunding. The practical effect of reasonable adjustments ought to be to realize more cash than forced sales of property which is not worth the taxes against it. It is a practical business matter within the range of a proceeding such as this. The consent of creditors to it is given through the bankruptcy machinery. The court has retained jurisdiction, and any abuse can be dealt with as it may arise.

■ It is also said that the plan does not expressly require the City to apply these collections to the purposes of the plan. We think that is the fair implication. It is only because the collections are to inure to the plan that it concerns itself with them.

■■ 7. Grave questions are made touching the compensation of the Fiscal Agent, and its reimbursement for expenses in connection with the plan. The Act provides, Sect. 83(b): "At the hearing, or a continuance thereof, the judge may allow * * * the actual and necessary expenses incurred in connection with the proceeding, including compensation for services rendered and expenses incurred in obtaining the deposit of securities and the preparation of the plan, whether such work may have been done by the petitioner or by committees or other representatives of creditors, and may allow reasonable compensation for the attorneys or agents of any of the foregoing, and may apportion the amount so determined among the parties to the proceeding as may be just." A proviso follows that nothing shall be assessed against the petitioner or its revenues or funds except as may be provided in the plan. The proviso is not important here because the whole allowance is provided in the plan, and also because none of it is assessed against the City or its revenues or funds, but all is assessed proportionately against the security holders. The proviso, however, does indicate that it is not inappropriate for the plan to deal with the matter of compensation, the allowance being at last the act of the judge. The vote of the creditors upon the plan does not at all bind the judge in finally allowing compensation.

The judge here at once on his own motion criticized the plan of compensation, and gave time to remove his objections. A modification was suggested, and after notice to all creditors was finally approved. In its final form $40.00 per thousand of securities refunded was to be paid by the holders to the Fiscal Agent, or at their option they might pay $20.00 per thousand and sell to the Agent the coupons maturing before Jan. 1, 1937, at a price which was supposed to be about what would be gotten by escrowing them as above described. Stated otherwise, 4% was charged on a par basis, with an option to pay 2% and give the Agent a speculative opportunity through the purchase of the old coupons. Though in the aggregate this runs to a considerable sum, from the standpoint of the several bondholders it is not unreasonable for rescuing the investment from chaos and putting it on a fairly sound basis. From the Agent's standpoint there is regrettable indistinctness as to what the proposed payment is for. The effort at refunding began in December, 1936. The Agent printed, had executed

and validated the refunding bonds, or most of them, before bankruptcy was contemplated. It located most of the security holders and obtained many consents, and no doubt expended much labor and some money. On June 24, 1938, the City authorized the Agent to proceed in bankruptcy, the Agent to "pay all costs, charges and expenses of every nature whatsoever * * * and the City shall not be obligated for any portion of such costs." As we understand it, the City was never to pay and does not owe the Agent anything. The allowance by the Court covers everything. Since the Act itself, Sect. 83(j), provides that a plan previously begun can be perfected in bankruptcy, we think expenses and services in connection with this very plan, though antecedent to the bankruptcy petition, follow the plan and could be considered by the Court. The cost of the bonds and of their validation, past and future, was proven. The cost of office and expert service could not be accurately proven because R. E. Crummer & Company was engaged on so many such tasks at once. The evidence was uncontradicted that their business was done with efficiency and experience and general success, and that at 2% it would be at a loss, and that in the present case on the basis proposed it might or might not prove profitable. The agent, it may be mentioned, is to pay the City's special attorney who is looking after the City's interests, and is to pay also for a legal opinion on the validity of the refunding bonds. It is to carry through the escrow business, and the final exchanges of securities, which will require a year more of service. As to amount, we are not prepared to overrule the allowance of the judge. As to its imposition on the creditors as a proportionate assessment, that is authorized by the words of the Act above quoted. As was the judge, we are troubled by the element of speculation on the Agent's part in the old coupons, but that comes into play only at the option of a couponholder who would rather take cash and reduce his assessment than to speculate himself. The holder has his choice. Nor is one assessed $40 and another $20 per thousand as is argued. All are assesssed $40 per thousand, but the Agent is allowed to trade off a part of the assessment if the couponholder wishes. This may lead to discontents or even scandals, and we do not in principle approve it, but will not overrule the judge at this stage of the proceedings and on an imperfect record of what happened before him.

8. There is an argument that the Agent owns some bonds, and a large judgment, that it also represented some creditors when it accepted its employment as Fiscal Agent, and its interests are therefore conflicting. The principle invoked has no application here. It is not apparent that there are any conflicting interests. The City was well aware of the Agent's previous relations. The Act itself allows expenses and compensation to be fixed for persons having all sorts of relations to the case. No disqualification to claim compensation appears. The consent of the vast majority of the creditors to the very allowance in question strongly supports the action of the judge.

Judgment affirmed.